# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 9:15-cv-81139-COHN/SELTZER

| | |
|---|---|
| Benjamin Hankinson, James Guerra, and Jeanette Gandolfo, Lisa Palmer, Donald Anderson, and Lisa Prihoda, individually and on behalf of others similarly situated,<br><br>          Plaintiffs,<br><br>          v.<br><br>R.T.G. Furniture Corp., d/b/a Rooms to Go, RTG America, LLC, The Jeffrey Seaman 2009 Annuity Trust, RTG Furniture Corp. of Georgia, d/b/a Rooms to Go, RTG Furniture of Texas, L.P., d/b/a Rooms to Go, RTG Texas Holdings, Inc., and R.T.G. Furniture Corp. of Texas,<br><br>          Defendants. | **CLASS ACTION** |

# PLAINTIFFS' MEMORANDUM IN SUPPORT OF CLASS CERTIFICATION

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ..................................................................................................... 1

II.    FACTUAL BACKGROUND ................................................................................... 1

    A.     The ForceField Protectants ........................................................................... 1

    B.     Defendants' ForceField Protection Plans....................................................... 2

    C.     How RTG Sells the ForceField Plans ............................................................ 3

    D.     How RTG Applies the ForceField Protectants .............................................. 4

    E.     How RTG Tests the ForceField Protectants .................................................. 7

    F.     Plaintiffs' Experience..................................................................................... 7

    G.     Plaintiffs' Experts ......................................................................................... 8

        1.     Marco Kaltofen, Ph.D. ...................................................................... 8

        2.     Randy Meirowitz, Ph.D. .................................................................... 8

        3.     Lenny Backer ..................................................................................... 9

        4.     Chris Jackman .................................................................................... 9

        5.     Steve Gaskin...................................................................................... 10

        6.     Colin Weir ......................................................................................... 10

III.   STANDARDS FOR CLASS CERTIFICATION...................................................... 11

IV.    ARGUMENT ........................................................................................................... 11

    A.     Plaintiffs' Classes Are Properly Defined and Ascertainable ........................ 12

    B.     Plaintiffs Can Establish The Rule 23(a) Elements........................................ 12

        1.     The Number of ForceField Purchasers is Numerous ........................ 12

        2.     The Class Members Present Common Questions of Law and Fact ................ 12

        3.     Plaintiffs Present Typical Claims...................................................... 13

        4.     The Plaintiffs and Their Counsel Will Adequately Represent the Classes ...... 14

    C.     Plaintiffs Meet the 23(b) Requirements for the Non-Slamming Claims .................. 14

        1.     Common Questions Predominate........................................................ 14

            a.     Breach of Contract.................................................................. 16

            b.     Unjust Enrichment.................................................................. 17

            c.     FDUTPA ................................................................................ 17

            d.     Damages Can be Calculated Class-Wide for the b(3) Class .................. 18

i

2.    Class Treatment is Superior ........................................................................... 19

C.    The Court Should Certify the Slamming Class Under Rule 23(c)(4) and (5) ............ 19

V.   CONCLUSION ................................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allapattah Servs. Inc. v. Exxon Corp.*,
   333 F.3d 1248 (11th Cir. 2003) .......................................................................14, 16

*Beattie v. CenturyTel, Inc.*,
   234 F.R.D. 160 (E.D. Mich. 2006), *aff'd in part, remanded in part*, 511 F.3d
   554 (6th Cir. 2007)..........................................................................................20

*Estate of Bluma Weinstock v. ADT LLC*,
   Case No. 15-cv-1391-pp, 2016 WL 3676486 (E.D. Wis. July 7, 2016)................16

*Britt Green Trucking, Inc. v. FedEx Nat. LTL, Inc.*,
   511 Fed. Appx (11th Cir. 2013)..........................................................................16

*Washington v. Brown & Williamson Tob. Corp.*,
   959 F.2d 1566 (11th Cir. 1992) ..........................................................................11

*Bush v. Calloway Consolidated Group River City, Inc.*,
   No. 3:10-cv-841-J-37MCR, 2012 WL 1016871 (M.D. Fla. Mar. 26, 2012) ...........11

*Carriuolo v. General Motors Co.*,
   823 F.3d 977 (11th Cir. 2016) .................................................................11, 17, 18

*In re Checking Account Overdraft Litig.*,
   286 F.R.D. 645 (S.D. Fla. 2012)....................................................................12, 16

*Collins v. DaimlerChrysler Corp.*,
   894 So.2d 988 (Fla. Dist. C. App. 2004) ..............................................................18

*Comcast Corp. v. Behrend*,
   133 S.Ct. 1426 (2013).........................................................................................11

*In re Conagra Peanut Butter Prod. Liab. Litig.*,
   251 F.R.D. 689 (N.D. Ga. 2008)..........................................................................11

*County of Monroe, Fla. v. Priceline.com, Inc.*,
   265 F.R.D. 659 (S.D. Fla. 2010)..........................................................................17

*Cox v. Am. Cast Iron Pipe Co.*,
   784 F.2d 1546 (11th Cir. 1986) ...........................................................................12

*Davis v. Powertel, Inc.*,
   776 So.2d 971 (Fla. 1st DCA 2000) .....................................................................17

*Duke Galish, LLC v. Manton*,
  208 Ga. App. 316, 707 S.E.2d 555 (2011)................................................................16

*In re Great Southern Life Insurance Co. Sales Practices Litig.*,
  192 F.R.D. 212 (N.D. Tex. 2000) ............................................................................16

*Karhu v. Vital Pharm. Inc.*,
  13-60768-CIV, 2014 WL 815253 (S.D. Fla. Mar. 3, 2014) ....................................13

*Khoday v. Symantec Corp.*,
  No. 11-180, 2014 WL 1281600 (March 13, 2014) ..........................................14, 18

*Klay v. Humana, Inc.*,
  382 F.3d 1241 (11th Cir. 2004) ..............................................................................14

*Kleiner v. First Nat. Bank of Atlanta*,
  97 F.R.D. 683 (N.D. Ga. 1983)................................................................................16

*Kornberg v. Carnival Cruise Lines, Inc.*,
  741 F.2d 1332 (11th Cir. 1984) ..............................................................................13

*Muzucco v. Re$ubmit, LLC*,
  297 F.R.D. 504 (S.D. Fla. 2013) .......................................................................13, 17

*Nelson v. Mead Johnson Nutrition Co.*,
  270 F.R.D. 689 (S.D. Fla 2010) ...............................................................................17

*Reyes v. Netdeposit, LLC*,
  802 F.3d 469 (3d Cir. 2015)......................................................................................17

*Rollins, Inc. v. Butland*,
  951 So.2d 860 (Fla. 2d DCA 2006) .........................................................................17

*Sanchez-Knutson v. Ford Motor Corp.*,
  310 F.R.D. 529 (S.D. Fla. 2015).........................................................................14, 18

*Stires v. Carnival Corp.*,
  No. 6:02-CV-542-ORL31JGG, 2003 WL 21356781 (M.D. Fla. Jan. 2, 2003).......18

*In re Terazosin Hydrochloride Antitrust Litig.*,
  220 F.R.D. 672 (S.D. Fla. 2004)........................................................................12, 19

*In re Tri-State Crematory Litig.*,
  215 F.R.D. 660 (N.D. Ga. 2003)...............................................................................16

*Valley Drug Co., v. Geneva Pharm., Inc.*,
  350 F.3d 1181 (11th Cir. 2003) ..............................................................................14

*Vega v. T-Mobile USA, Inc.*,
    564 F.3d 1256 (11th Cir. 2009) ......................................................................19

*Williams v. Mohawk Indus., Inc.*,
    568 F.3d 1350 (11th Cir. 2009) ......................................................................11

*Williams v. Mohawk Indus., Inc.*,
    568 F.3d1350 (11th Cir. 2009) .......................................................................12

*Williams v. Wells Fargo Bank, N.A.*,
    280 F.R.D. 665 (S.D. Fla. 2012) ...............................................................13, 17

**Rules**

Fed. R. Civ. P. 23 ................................................................................... passim

## I.     INTRODUCTION

Plaintiffs and prospective class members purchased an add-on service from furniture seller Rooms To Go ("RTG").[1] For about 10% of their furniture's price, RTG promises its customers that their furniture will be professionally treated prior to delivery with a product called ForceField that will repel common household food and beverage spills. RTG charges a premium for their ForceField protection plan add-ons, as Plaintiffs could buy an entire bottle of ForceField from Shield Industries, or a similar stain-repellant like Scotchgard™, for far less than what RTG charges for a one-time application.

Plaintiffs paid for RTG's promise of professional treatment, but did not get what they bargained for. RTG's application practices are not remotely professional: ████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████ The end result: every piece of RTG furniture that Plaintiffs have had tested shows no evidence of the ForceField product. This corresponds with basic math: RTG sold far more ForceField protection plans than their supplies of ForceField protectants could reasonably cover –averaging an application of less than ██ ounces of protectant per each piece during the class periods. Plaintiffs seek state-wide damages classes on behalf of all ForceField plan purchasers who overpaid for this deceptive service.

Plaintiffs also seek a separate subclass on behalf of Florida residents who did not even intend to buy the ForceField plans. ██████████████████████████████ ████████████████████████████ Even then, RTG sales staff will try to still sneak the charge past a customer, and then discard the ForceField agreement intended for her. This practice, called slamming, was tolerated and encouraged by RTG, and befell Plaintiff Lisa Palmer. Ms. Palmer seeks an issue certification on behalf of all Floridians to try the common issue of whether RTG's conduct constituted a deceptive practice under the FDUTPA.

## II.    FACTUAL BACKGROUND

### A.     The ForceField Protectants

Shield Industries ("Shield") sells furniture protectants under the name ForceField. ████



---

[1] Defendants include RTG entities that directly sell the ForceField plans to customers (R.T.G. Furniture Corp., RTG Furniture Corp. of Georgia, and RTG Furniture of Texas, L.P.), and those related entities that may receive the revenues from those sales (RTG America, LLC, The Jeffrey Seaman 2009 Annuity Trust, RTG Texas Holdings, Inc., and R.T.G. Furniture Corp. of Texas).

███████████████████████████████████████████████
████████████ ██ RTG uses these protectants as the namesake of their ForceField protection plans.[3] Shield sells 22 ounce bottles of the protectants for $14.95.[4] The "Service Application Instructions" for the Fabric Protector recommend "pretesting" the furniture to insure no color transfer; removing all tags, and wrappings; holding the spray 12 inches from the fabric; applying it in overlapping sweeping motions to evenly wet the fabric; leaning the cushions in a Tee-Pee style to dry; letting the protectant cure for 24 hours; and spot testing for repellency by placing a drop of water on the fabric after treatment.[5] Shield also recommends coverage amounts of 16 ounces for a sofa, 12 ounces for a love seat, and 8 ounces for a chair.[6]

### B.    Defendants' ForceField Protection Plans

Each purchaser of one of Defendants' ForceField protection plans receives a one-page certificate that sets out the terms of the plan agreement.[7] Each agreement has a place to include a "warranty number", and the customer's name. The agreements use common language to describe the customers and RTG's obligations. "Your furniture will be professionally treated before delivery to resist all food and beverage spills that occur in most households."[8] ████████████
███████████████████████████████████████████████████ █
███████████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████ █

The warranty portion of the ForceField plan certificates is effective for three years,

---

[2] Tab 1, Bilbro Ex. 6.

[3] Tab 2, Def. Amended Resp. to First Set of Interrog. No. 1; Tab 3, Mar. 31, 2016 Dep. of R. Bilbro ("Bilbro Dep.") at 35:20-36:2.

[4] *See, e.g.*, https://secure.shieldindustries.com/store/ as accessed Aug. 29, 2016.

[5] *Id.* See also Bilbro Dep. at 66:23-68:4 (testing via drop method); Tab 4, Bilbro Ex. 11 (emails regarding testing of the protectant on a RTG textile, noting █
███████████████████████ █).
   Bilbro Ex. 6 at 1. *See also*, Tab 5, Bilbro Ex. 7 (Technical Data Sheet for AQ Water Based ForceField Fabric Protector).

[7] Tab 6, DE 2 (Hankinson ForceField Agreement); Tab 7, PX 30 (leather protection plan agreement). ████████████████████████████████████████████
█████████████████████ █
   *Id.*

[9] Tab 9, Aug. 25, 2016 Dep. of S. Buckley at 6:12-7:9.

[10] *Id.* at 18:15-19

[11] *Id.* at 165:1-166:1

beginning from the data of delivery.[12] For the fabric protection plan, RTG promises that, "[i]n the event that the stain becomes permanent from normal food and beverage spills … ROOMS TO GO, at its discretion," will send an authorized technician to clean it, reupholster the stained area, or replace the furniture.[13]



### C.   How RTG Sells the ForceField Plans

RTG strongly encourages sales associates to push customers to buy the ForceField plans.



Clementine Bender, a former RTG employee, saw RTG sales representatives frequently place ForceField plans on customers' bills without their knowledge ("slamming") at her store.[22] Ms.

---

[12] *Id.*

[13] Tab 6, DE 2. The ForceField Leather Protection Plan has the identical promise.

[14] Tab 10, June 9, 2016 Dep. of 30(b)(6) witness K. Otis at 23:14-20.

[15] Otis Dep. at 148:3-149:13; 168:21-169:2.

[16] Tab 2, Defs. Amended Resp. to First Set of Interrog. Resp. No. 12. Otis Dep. at 50:19-23; 141:19-23; 143:12-24

[17] Tab 9, Buckley Dep. at 172:11-20

[18] Tab 11, R.T.G. Furniture Corp.'s Supplemental Rog Responses, Interrog. No. 11; Tab 12, RTG Furniture of Texas, L.P. Rog Responses, Interrog. No. 9; Tab 13, RTG Furniture Corp. of Georgia, Interrog. No. 9.

[19] Tab 14, Kalick Dep. at 138:23-139:21. *See e.g.,* Tab 15, Plaintiffs' Exhibit 73, page 1.

[20] *See e.g.,* Tab 16, Plaintiffs' Exhibit 71, page 1

*See* Tab 17, PX 68; Tab 8, Corn Dep. at 38:7-21; Tab 18, Aug. 29, 2016 Dep. of C. Bender at 147:24-148:17.

[22] Tab 19, Bender Decl., at ¶ 4.

Bender heard and taped her colleagues discussing slamming.[23] Ms. Bender traveled to other RTG stores, and found sales staff there also attempting to sneak ForceField plans on to her bill.[24] During her investigation, Ms. Bender observed and collected discarded ForceField certificates meant for customers that would have alerted the customers of the add-on purchase.[25]

RTG has made a remarkable profit on the ForceField plans.



### D.    How RTG Applies the ForceField Protectants

RTG applies the ForceField protectants at its six distribution centers prior to customer pick up or delivery. Lakeland Florida is the largest center,

---

[23] Bender Decl., at ¶ 5-7; Bender Dep., at 84:10-25.

[24] *See, e.g.,* Bender Dep. at 69:7- 70:11.

[25] *See e.g.,* Tab 34, Bender Retrieved Certificates.

[26] Tab 20, Bilbro Ex. 2 (RTG purchase data from 2011-2015); Tab 21, Bilbro Ex. 3 (RTG purchase data including Georgia for 2009-10, and Florida and Louisiana for 2010).

Tab 22, Sept. 1, 2016 Declaration of C. Jackman ("Jackman Decl.") at ¶6.

[28] Tab 9, Buckley Dep. at 42:9-44:22.

[29] Tab 23, Dep. of B. Bongiovanni, ("Bongiovanni Dep.") at 19:7-21; 21:22-24:19.

[30] Tab 24, June 2, 2016 Dep. of D. Bennett ("Bennett Dep.") at 30:12-18; Tab 25, Aug. 17, 2016 Dep. of A. Day ("Day Dep.") at 11:5-12:4; Tab 63, Apr. 26, 2016 Dep. of E. Yanowitz ("Yanowitz Dep.") at 14:3-15; Day Dep. 14:9-16:19, 17:17-18:8; Bongiovanni Dep. at 14:9-16:22; Tab 9, Buckley Dep. at 58:7-64:7, 166:12-17.

[31] Buckley Dep. at 49:4-50:20; Bongiovanni Dep. at 32:5-19.

[32] *See, e.g*., Bennett Dep. at 17:6-21; 34:3-35:23; Yanowitz Dep. at 12:13-13:11; Tab 26, June 2, 2016 Dep. of T. Maldonado ("Maldonado Dep.") at 18:4-19:18; Day Dep. at 36:14-37:16.



---

[33] Tab 27, PX 4 (pages RTG0000888; '931, '932).

[34] PX 4 at RTG0000932.

[35] Yanowitz Dep. at 24:7-27:12; Bongiovanni Dep. at 39:2-7.

[36] Tab 28, PX 24. ███████████████████████████████████████████

Bennett Dep. at 40:23-45:17; Yanowitz Dep. 52:25.-54:15.

[38] *See, e.g.*, Tab 29, PX 5, Tab 30, PX 6, Tab 31, PX 9, Tab 32, PX 10, Tab 33, Bilbro Ex. 12.

[39] Tab 21, Bilbro Ex. 3.

[40] Tab 35, PX 13.

[41] *See* ECF No. 110 (Plaintiffs' Motion to File Video Exhibits) at RTG00001187. ██████

████████████████████████████████████████ at *Id.* at RTG00001188. Upon order from the Court, Plaintiffs will submit these videos.

[42] PX 13, Tab 25, Day Dep. at 7:4-23, 64:19-66:2.

[43] PX 13 (emphasis added). ███████████████████████████████████████████████████████████████████████████████████████████



”); Tab 31, PX 9

(2013 email noting

Tab 9, Buckley Dep. at 78:14-81:18.
[45] Tab 37, PX 15.
[46] Tab 23, Bongiovanni Dep. at 75:17-25.
[47] ECF No. 110, video at RTG0001185 and RTG0001186.
[48] Tab 38, PX 17.
[49] Tab 39, PX 100. *See also* Tab 43, PX 102                        ).



### E.    How RTG Tests the ForceField Protectants

[REDACTED][53] Shield recommends that "to assure that surfaces retain a proper level of protection, they should be re-treated once per year or after cleaning."[54] [REDACTED]

### F.    Plaintiffs' Experience

Plaintiffs all purchased one or more ForceField plans from RTG stores, paying between $69.99 to $279.96.[60] Except for Lisa Palmer, Plaintiffs purchased the plans so that their furniture

---

[50] Tab 40, PX 21.

[51] Bongiovanni Dep. at 53:12-54:6.

[52] Tab 41, PX 42 [REDACTED]

   *See, e.g.,* Bennett Dep. at 14:23-15:3, 16:1-8, 18:7-19; Yanowitz Dep. at 14:25-15:6; Maldonado Dep. at 15:21-17:20; Day Dep. at 28:4-29:2; Buckley Dep. at 69:6-72:11, Tab 42, Def. Resp. to Third Set of Interrog. No. 1 at 5 [REDACTED] *See, e.g.,* Tab 16, Plaintiffs' Exhibit 71, page 1. [REDACTED] Kalick Dep. at 171:15-19. Tab 5, Bilbro Ex. 7.

[55] Tab 14, Kalick Dep. at 171:1-172:1. [REDACTED] *See, e.g.,* Tab 16, Plaintiffs' Exhibit 71, page 1. Tab 42, Def. Resp. to 3rd Set of Interrog. No. 2(f) at 7; Tab 26, Maldonaldo Dep. at 11:2-14.

[57] Tab 3, Bilbro Dep. at 20:20-21:10; Tab 4, Bilbro Ex 11; Maldonado Dep. at 27:21-29:6.

[58] Tab 10, Otis Dep. at 92:6-17; Kalick Dep. at 86:11-18.

[59] Kalick Dep. at 155:7-18.

[60] *See* Tab 44, DE 1; Tab 45, DE 5; Tab 46, DE 8; Tab 47, DE 9; Tab 48, DE 10; Tab 49, DE 23; Tab 50, DE 27; Tab 51, DE 29.

would be treated with ForceField protectants.[61] Lisa Palmer did not intend to purchase a plan, but was slammed.[62] None of the Plaintiffs were interested in the ForceField plan for its warranty.[63] All of the Plaintiffs have demonstrated their willingness and ability to represent other RTG purchasers by sitting for depositions, and answering multiple sets of interrogatories and requests for production.[64]

### G.    Plaintiffs' Experts

Before and after filing this case, Plaintiffs retained several experts to assist in prosecuting the claims.

#### 1.    *Marco Kaltofen, Ph.D.*

Dr. Marco Kaltofen is a principal at Boston Chemical Data, Corp.[65] Dr. Kaltofen has a Ph.D. in civil engineering, specializing in the study of chemicals such as perfluorinated compounds (PFCs).[66] Before suit, Dr. Kaltofen tested furniture he bought from RTG online with and without the ForceField plans, for the presence of perfluorinated compounds (PFCs). These compounds should be present if the ForceField protectants (a perfluorinated alkyl copolymer) were applied.[67] He also tested the Plaintiffs furniture for the presence of PFCs.[68] Dr. Kaltofen found no detectable levels of PFCs on any of the furniture.[69]

#### 2.    *Randy Meirowitz, Ph.D.*

Dr. Meirowitz is a surface and advanced materials scientist with over 30 years of experience in surface science, including the testing of textiles.[70] Dr. Meirowitz examined the fabric that Dr. Kaltofen purchased (both the untreated and supposedly treated) for stain

---

[61] *See e.g.,* Tab 52, Jan. 26, 2016 Dep. of Benjamin Hankinson at 21:14-18; Tab 53, Jan. 26, 2016 Dep. of James Guerra at 28:23-29:9; Tab 54, Jan. 27, 2016 Dep. of Jeanette Gandolfo at 85:6-15; Tab 55, July 21, 2016 Dep. of Donald Anderson at 28:14-25; Tab 56, July 22 Dep. of Lisa Prihoda at 21:18-22:23.

[62] Tab 57, July 21, 2016 Dep. of Lisa Palmer at 52:12-53:19;

[63] *See e.g.,* Hankinson Dep. at 81:4-15; Guerra Dep. at 74:5-20; Gandolfo Dep. at 86:19-24; Anderson Dep. at 29:1-19; July 22 Dep. of Lisa Prihoda at 22:24-23-6.

[64] Plaintiffs Benjamin Hankinson, James Guerra, and Jeanette Gandolfo also demonstrated their willingness to serve the interests of the putative class by rejecting a $2,000 offer from RTG to dismiss their claims. *See e.g.,* Guerra Dep. at 77:12-78:4

[65] Tab 58, Expert Report of M. Kaltofen, Ph.D. ("Kaltofen Report").

[66] *Id*. at ¶3.

[67] *Id*. at ¶¶ 5, 7, 10, 11, 22.

[68] *Id*.

[69] *Id*. at ¶ 18.

[70] Tab 59, Expert Report of R. Meirowitz, Ph.D. ("Meirowitz Report"), at ¶2.

repellency, and also tested the efficacy of the ForceField protectant on a sample fabric.[71] Dr. Meirowitz used a repellency test developed by the American Association of Textile Chemists and Colorists, which involves applying drops of standard liquids to surface of varying tensions.[72] Dr. Meirowitz found that both of the fabrics Dr. Kaltofen had purchased from RTG showed no repellency.[73] When he treated samples with ForceField as per Shield's instructions, Dr. Meirowitz found repellency scores consistent with the product's manufacturer.[74] He then compared the results by treating the same fabric with Scotchgard™ and found similar efficacy.[75] He had Vartest Laboratories undertake a more quantitative analysis in a lab setting that confirmed his findings.[76] Dr. Meirowitz concludes that the supposedly treated furniture that Dr. Kaltofen purchased was not, in fact, treated with ForceField.[77]

### 3.   Lenny Backer

Lenny Backer has been in the furniture business for over 25 years, involved in logistics, distribution, and quality control.[78] ████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
██████████████████████████   ██████   ████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████   ████████████████████████████████████████████████████
████████████████[82]

### 4.   Chris Jackman

Chris Jackman is a Managing Director with Nathan & Associates, Inc. Mr. Jackman was

---

[71] *Id.* at ¶1.
[72] *Id.* at ¶¶31-34
[73] *Id.* at ¶¶38-40.
[74] *Id.* at ¶41.
[75] *Id.* at ¶42.
[76] *Id.* at ¶¶43-45
[77] *Id.* at ¶48.
[78] Tab 60, Expert Report of L. Backer at 2
[79] *Id.* at ¶¶1-7.
[80] *Id.* at ¶8.
[81] *Id.* at ¶¶8-32.
[82] *Id.* at ¶¶39-48. See also ECF No 110, McNamara Videos 1-4.

given the tedious tasks of aggregating the eighteen separate Excel files that contained the RTG's ForceField Plan sales data of the different RTG entities in this case, assembling the ForceField purchasing data of those entities, and calculating the amount of protectant applied for different furniture categories (namely chairs, sofas, and loveseats).[83]

### 5.    Steve Gaskin

Steve Gaskin is a principal of Applied Marketing Science, Inc. ("AMS"), a market research and consulting firm.[87] Mr. Gaskin has agreed to survey customers of furniture stores like RTG in the affected states to calculate the value of the ForceField protectant component, and the warranty component, of the ForceField protection plans.[88] Mr. Gaskin will use conjoint analysis as his method.[89] Conjoint analysis uses data on feature preferences showed to potential customers to determine what partial contribution or "partworth" that feature lends to overall product utility.[90] Mr. Gaskin will use descriptors for the different levels of the "fabric protectant" feature rooted from evidence in this case, including options where the protectant is applied on all surfaces and allowed 24 hours to cure, or the surfaces are not all covered, or the protectant amount is below the recommended levels, or the time to dry is an hour.[91]

### 6.    Colin Weir

Colin Weir is an economist with a Masters of Business Administration, and has been

---

[83] Tab 22, Decl. of C. Jackman at ¶6.
[84] *Id*. at ¶8
[85] *Id*. at ¶17, Table 6.
[86] *Id*. at ¶19, Table 7.

Tab 61, Gaskin Declaration at ¶¶1, 2.
[88] *Id*. at ¶4.
[89] *Id*. at ¶5.
[90] *Id*.
[91] *Id*. at ¶12.

asked to calculate damages on a class wide basis for all purchasers of the ForceField plans in the affected states.[92] He will rely on Defendants' records, Mr. Gaskin's survey, Mr. Jackman's calculations, and Dr. Meirowitz's opinions to come up with a formula to calculate the amount of refund. This formula will include the total sales made (as calculated by Jackman), the portion of the purchases attributable to the market value for the warranty portion of the ForceField plans (as obtained from Gaskin), and the market value for the protectant application as delivered v. as promised (also obtained from Gaskin).[93] Mr. Weir has worked with Mr. Gaskin previously as well as other conjoint analyses, to provide damage models accepted by federal courts.[94] Mr. Weir also examines Defendants' own documents to determine how it valued the warranty, and any costs associated with it.[95]

## III.   STANDARDS FOR CLASS CERTIFICATION

In deciding whether to certify a class, a district court has broad discretion. *Washington v. Brown & Williamson Tob. Corp.*, 959 F.2d 1566, 1569 (11th Cir. 1992). The moving party must affirmatively demonstrate compliance with all of Rule 23's requirements. *Comcast Corp. v. Behrend,* 133 S.Ct. 1426, 1432 (2013). First, the class must be "adequately defined and clearly ascertainable." *Carriuolo v. General Motors Co.,* 823 F.3d 977, 984 (11th Cir. 2016). Next, the Court considers whether the Rule 23 factors are met. *Bush v. Calloway Consolidated Group River City, Inc.*, No. 3:10-cv-841-J-37MCR, 2012 WL 1016871, at *3 (M.D. Fla. Mar. 26, 2012). This will include the 23(a) factors of numerosity, commonality, typicality, and adequacy, and the 23(b) factors of common issues predominating over individual ones, and that class presents a superior method to proceeding individually. Fed. R. Civ. P. 23.

Class certification on limited issues, or a "hybrid class", is also available under pursuant to 23(c)(4). *Williams v. Mohawk Indus., Inc.,* 568 F.3d 1350, 1359 (11th Cir. 2009). The class issues must be one where its resolution materially advances the proceeding. *In re Conagra Peanut Butter Prod. Liab. Litig.*, 251 F.R.D. 689, 698 (N.D. Ga. 2008).

## IV.   ARGUMENT

Plaintiffs ask the Court to grant Plaintiffs' motion to certify the following classes:

1) Three classes certified under Fed. R. Civ. P. 23(b)(3) for all residents of Florida who

---

[92] Tab 63, Decl. of C. Weir at ¶¶2, 5.
[93] *Id*. at ¶11.
[94] *Id*. at ¶¶12-14.
[95] *Id*. at ¶¶15-17.

purchased ForceField protection plans from Defendants from August 12, 2010 to August 12, 2015; all residents of Georgia who purchased ForceField protection plans from Defendants from August 12, 2009 to August 12, 2015; and all residents of Texas who purchased ForceField protection plans from Defendants from August 12, 2011 to August 12, 2015.

2)      An issues only subclass under Fed. R. Civ. P. 23(c)(4) and (5) for all residents of Florida who purchased ForceField protection plans from Defendants, whose ForceField Protection Plans were added to their bills without their knowledge from August 12, 2011 to August 12, 2015.

The Court should certify these classes because Plaintiffs meet all of the requirements of Rule 23 and this Circuits' decisions interpreting it.

**A.      Plaintiffs' Classes Are Properly Defined and Ascertainable**

A class is ascertainable if the Court can determine whether a given person is a class member through administratively feasible means. *In re Checking Account Overdraft Litig.,* 286 F.R.D. 645, 650-51, & n. 7 (S.D. Fla. 2012). Here, each class includes all those who purchased ForceField plans at RTG stores in Georgia, Texas, and Florida. RTG conceded in their opposition to a motion to compel that "as to ascertainability, Defendant (R.T.G. Furniture Corp) … maintains information that identifies its customers who have purchased ForceField protection plans." ECF No. 50 at 14. Whether the customers purchased the plans knowingly or not, RTG knows who they are. Therefore, all of the class members are ascertainable.

**B.      Plaintiffs Can Establish The Rule 23(a) Elements**

*1.      The Number of ForceField Purchasers is Numerous*

While there is no rigid standard for determining numerosity, the Eleventh Circuit has held that less than 21 is inadequate, and more than forty, adequate. *Cox v. Am. Cast Iron Pipe Co.,* 784 F.2d 1546, 1553 (11th Cir. 1986). Defendants have produced sales data showing ███████ transactions for the ForceField plans in Florida, Georgia, and Texas. Tab 22, Jackman Decl. at ¶8. RTG also previously conceded numerosity. ECF No. 50 at 14. Numerosity is satisfied.

*2.      The Class Members Present Common Questions of Law and Fact*

Rule 23(a)(2) requires the presence of law and fact common to the class. The Eleventh Circuit has noted that this requirement is a "low hurdle." *Williams v. Mohawk Indus., Inc.,* 568 F.3d1350, 1356 (11th Cir. 2009). It is met when a plaintiff alleges the defendant engaged in a

standardized course of conduct that affects all class members. *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 685-86 (S.D. Fla. 2004). Common issues here include:

- Which of the Defendants are subject to the terms of the ForceField agreements;

- For entities not subject to the agreements, whether they were unjustly enriched;

- Whether RTG professionally treats its furniture with the ForceField products consistent with its own standards, Shield's standards, or industry standards;

- Whether RTG omitted material information regarding its application methods, ███████████████████████████████████████;

- The value of the warranty accompanying the ForceField agreements; and

- Whether Defendants condoned and encouraged slamming of its customers.

Answering these common questions will support FDUTPA claims against the Florida Defendants. Similarly, the answers will drive resolution of the breach of contract claims against Defendants R.T.G. Furniture Corp, RTG Furniture Corp. of Georgia, and RTG Furniture Corp. of Texas, L.P., and the unjust enrichment claims available against the "non-operative" entities that did not sell the ForceField plans directly to consumers (The Jeffrey Seaman 2009 Annuity Trust, RTG America, LLC, RTG Texas Holdings, Inc.). *See, e.g., Williams v. Wells Fargo Bank, N.A.*, 280 F.R.D. 665, 672 (S.D. Fla. 2012) (finding commonality met where plaintiffs alleged contract claims against bank and unjust enrichment claims against mortgage servicer, in force-placed insurance scheme).

### 3.    Plaintiffs Present Typical Claims

Claims are typical when they all arise from the same event, pattern, or practice, and are based upon the same legal theory. *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984). Here, all of the claims involve the purchase of ForceField Plans, where the terms and omissions were uniform. While Ms. Palmer's slamming claim carries an additional component, her claim also contains the common legal question of whether she received any value as a result of her (unintended) purchase of the ForceField plan. Class members' claims need not be identical to satisfy the typicality requirement; rather there need only exist a sufficient nexus between the legal claims of the named class representatives and those of individual class members to warrant certification. *Muzucco v. Re$ubmit, LLC*, 297 F.R.D. 504, 516 (S.D. Fla. 2013). Likewise, whether a customer bought the leather plan or the fabric plan does not matter, as their claims are based on the same fact pattern (the common language in the protection plans)

and legal theories (failure of RTG to abide by its promises or disclose material information). *Karhu v. Vital Pharm. Inc.,* 13-60768-CIV, 2014 WL 815253, *4 (S.D. Fla. Mar. 3, 2014). Typicality is met.

> 4.    *The Plaintiffs and Their Counsel Will Adequately Represent the Classes*

Rule 23(a)(4) requires that that parties fairly and adequately protect the interests of the class. This means demonstrating 1) no substantial conflicts of interest exist between the representatives and the class, and 2) the representatives will adequately prosecute the case. *Valley Drug Co., v. Geneva Pharm., Inc.,* 350 F.3d 1181, 1189 (11th Cir. 2003). Here, none of the Plaintiffs have any conflicts of interests – all are seeking Defendants return the overcharge they exacted for their respective states. All are aware of the case issues, have been deposed, answered interrogatories and made documents available. In fact, several turned down an offer of $2,000 in order to make sure the class is supported. *See e.g.,* Tab 53, Guerra Dep. at 77:12-78:4.

Plaintiffs are represented by counsel that is also adequate. Cohen Milstein has been class counsel in hundreds of cases, and has experience in consumer class cases asserting similar theories. *See, e.g., Khoday v. Symantec Corp.,* No. 11-180 (JRT/TNL), 2014 WL 1281600 (March 13, 2014); *See also* Tab 65 (2016 Firm Resume). Absent specific proof to the contrary, the adequacy of counsel is presumed. *Sanchez-Knutson v. Ford Motor Corp.*, 310 F.R.D. 529, 540 (S.D. Fla. 2015).

**C.    Plaintiffs Meet the 23(b) Requirements for the Non-Slamming Claims**

> 1.    *Common Questions Predominate*

Predominance is met when there exists generalized evidence that proves or disproves an element on a simultaneous, class-wide basis. *Allapattah Servs. Inc. v. Exxon Corp.,* 333 F.3d 1248, 1260 (11th Cir. 2003). The common issues need not be dispositive to predominate, but instead must have a direct impact on every class members' efforts to establish liability. *Klay v. Humana, Inc*., 382 F.3d 1241, 1254 (11th Cir. 2004). One simple test for predominance, is "if the addition of more plaintiffs leaves the quantum of evidence introduced by the plaintiffs as a whole relatively undisturbed, then the common issues are likely to predominate." *Id.* at 1255.

Here, the common questions predominate. The ForceField plans were sold with contracts containing a common promise that the customer's "furniture will be professionally treated before delivery to resist all food and beverage stains that occur in most households." Tab 6, DE 2; Tab 7, PX 30. None of the named Plaintiffs, nor the class members, had their furniture professionally

treated to resist stains. Adding new plaintiffs would not increase the quantum of Plaintiffs' evidence significantly, as the failure to professionally treat the furniture can be shown by the Defendants' own documents and videos, as well as Plaintiffs' observations of RTG's practices. That evidence shows:



These application methods differ in degree but not in kind.

Finally, Dr. Kaltofen could find no evidence of the protectants on any furniture tested by

the Plaintiffs. Tab 58, Kaltofen Report at ¶18. This also suggests that whatever RTG does, it is wholly ineffective in carrying out its part of the bargain to the ForceField plan purchaser. This common conduct supports class certification on all of Plaintiffs' causes of action.

a. Breach of Contract

Breach of contract cases where there is a uniform written contract are routinely certified. *Kleiner v. First Nat. Bank of Atlanta*, 97 F.R.D. 683, 692 (N.D. Ga. 1983). To prove a contract claim a plaintiff must show an agreement was breached resulting in injury. *See, e.g., Duke Galish, LLC v. Manton*, 208 Ga. App. 316, 320, 707 S.E.2d 555, 559 (2011); *Britt Green Trucking, Inc. v. FedEx Nat. LTL, Inc.,* 511 Fed. Appx, 848, 850 (11th Cir. 2013). Here, RTG provided uniform written contracts promising each customer "your furniture will be professionally treated before delivery to resist all food and beverage spills that occur in most households." *Allapattah Services, Inc.,* 333 F.3d at 1261 (affirming class treatment of breach of contract claim where dealer agreements were materially similar, and whether Exxon breached duty to reduce price of wholesale gas was owed to the dealers as a whole). "Professionally treated" is not mere puffery here, as the context refers to the successful and competent application of a specific protectant so as to obtain a measurable result – stain-resistance. *See also Estate of Bluma Weinstock v. ADT LLC*, Case No. 15-cv-1391-pp, 2016 WL 3676486 at *6-7 (E.D. Wis. July 7, 2016) (rejecting argument that ADT's reference to its personnel as "trained professionals who would deliver a fast and appropriate response to an alarm" as puffery, finding the representation an issue of fact for the jury). ██████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████████████████ Whether RTG even met Buckley's standards when treating the furniture is a common predominating question. *See, e.g., In re Tri-State Crematory Litig.,* 215 F.R.D. 660, 692 (N.D. Ga. 2003) (certifying Georgia contract claims where predominate issues were whether funeral homes had breached contractual duty by mishandling decedents); *In re Checking Account Overdraft Litig.*, 286 F.R.D. 645, 655 (S.D. Fla. 2012) (certifying breach of contract and unjust enrichment claims related to how defendants re-ordered the transactions to maximize fees; rejecting argument that individual inquiries into each customers' transactions and expectations undermined class treatment); *In re Great Southern Life Insurance Co. Sales Practices Litig.,* 192 F.R.D. 212, 216-218 (N.D. Tex. 2000) (certifying breach of contract under Texas law where defendants omitted material

16

information about the actuarial tables and other formulas it used to calculate rate of returns).

        b.   <u>Unjust Enrichment</u>

The essential elements of a claim for unjust enrichment are: (1) a benefit conferred upon a defendant by the plaintiff, (2) the defendant's appreciation of the benefit, and (3) the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it. *Rollins, Inc. v. Butland,* 951 So.2d 860, 876 (Fla. 2d DCA 2006). Unjust enrichment claims may also be certified so long as the circumstances under which the defendant accepted the benefit does not change from each putative class member. *Williams*, 280 F.R.D. at 674. ███████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████ These Defendants, who may not be in privity with the class members on the plans, still appreciated a benefit for which it was not entitled. *See, e.g., County of Monroe, Fla. v. Priceline.com, Inc.,* 265 F.R.D. 659, 671 (S.D. Fla. 2010) (certifying unjust enrichment claims where defendants' business operation are the same to all members of the class); *Williams.,* 280 F.R.D. at 674-75 (certifying contract claims and unjust enrichment claims where defendants schemed to inflate forced-place insurance premiums); *Muzuco*, 297 F.R.D. at 521 (certifying Florida unjust enrichment claims where bank and third-party collected NSF fees in same manner for all class members).

        c.   <u>FDUTPA</u>

For the FDUTPA claims, the plaintiffs must show a deceptive act or unfair practice, causation, and actual damages. *Carriuolo,* 823 F.3d at 983. Plaintiffs do not need to show actual reliance. "Hence the impediment to class litigation that exists for multiple intrinsic fraud claims does not exist in the present case." *Davis v. Powertel, Inc.,* 776 So.2d 971, 973 (Fla. 1st DCA 2000). Instead, the plaintiff needs to show that the defendant's fraud caused economic harm to the purchaser –which can include an overcharge. *Nelson v. Mead Johnson Nutrition Co.,* 270 F.R.D. 689, 692 (S.D. Fla 2010) (holding causation provable by showing that "a deceptive practice allows a manufacturer or vendor to charge a premium for a product that the manufacture would not be able to command absent the deceptive practice."). The predominance test is usually readily met in consumer fraud cases where the focus is on the defendant's conduct as to all class members. *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 488-89 (3d Cir. 2015) (collecting cases).

RTG's conduct supports certification of the FDUTPA claims. First, there is ample

evidence of uniform misrepresentation to all purchasers via the plan agreement that RTG would "professionally treat" the furniture with a stain-repellent. Second, RTG omits material information, █████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

In addition, Plaintiffs can show causation through the overcharge to be calculated by Gaskin. As this Court recognized recently recognized (and as affirmed by the Eleventh Circuit), "a manufacturer's misrepresentations may allow it to command a price premium and to overcharge customers systematically." *Carriuolo*, 823 F.3d at 987. Plaintiffs contend that if the class members knew about the Defendants' deficient application of the protectants, than they would not have paid about 10% of the purchase price of their furniture for a one-time, ██ ounce application of protectant, ██████████████████████ at a price 3-6 times the cost of a 22 ounce ForceField bottle. Under an overcharge theory, RTG's misrepresentations and omissions caused harm to all purchasers, regardless of whether the purchaser ever got a stain. *See, e.g.*, *Collins v. DaimlerChrysler Corp.*, 894 So.2d 988, 991 (Fla. Dist. C. App. 2004) (holding actual damages pled by plaintiffs claiming vehicle had defective seatbelts; even though seatbelt never malfunctioned in accident, customer did not get what she bargained for). Gaskin's survey can further provide common evidence that the ForceField purchasers were overcharged and suffered injury. *See, e.g., Khoday v. Symantec Corp.,* No. CIV. 11-180 JRT/TNL, 2014 WL 1281600, at *33-34 (D. Minn. Mar. 13, 2014) (certifying consumer fraud claims finding Gaskin's conjoint survey evidence that showed that the market value of defendants' premium add-on service was *de minimis*, supporting plaintiffs' claim that all consumers were overcharged regardless of intention).

d. Damages Can be Calculated Class-Wide for the b(3) Class

For all of the claims, the measure of actual damages will be the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties. *Stires v. Carnival Corp.*, No. 6:02-CV-542-ORL31JGG, 2003 WL 21356781, at *2 (M.D. Fla. Jan. 2, 2003). This is the "benefit of the bargain." *Owner-Operator Ind. Drivers Ass'n, Inc., v. Landstar Sys.*, Inc., 622 F.3d 1307, 1326 (11th Cir. 2010); *Knutson-Sanchez*, 310 F.R.D. at 539.

Gaskin's conjoint analysis would then be used by Colin Weir to determine the amount of restitution due the class members. Tab 62, Weir Decl. The conjoint analysis can identify the value (if any) of the three-year stain protection warranty RTG provides. Weir will present evidence that the value of the warranty is further undercut because of the "discretionary" nature of it, and RTG's own evaluation of the warranty. *Id.* Defendants have argued that the warranty provided value to the class, regardless of the fabric protection. ECF No. 91 Defs.' Answer to the SAC at 55. ████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ █████████████████████████████████████████████████ The class jury can examine this evidence, and the testimony of Gaskin and Weir to assess the proper figure for class-wide damages.

### 2. Class Treatment is Superior

To assess the superiority of class treatment the Court must consider (a) the class members' interests in individually controlling the litigation; (b) the extent and nature of any litigation already begun by class members; (c) the desirability of concentrating the litigation into one forum, and (d) the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3). *Vega v. T-Mobile USA, Inc.,* 564 F.3d 1256, 1277-78 (11th Cir. 2009).

Here, the class members' interests is in a class resolution and not individual actions. It is too costly to take on these Defendants, who make hundreds of millions annually, and are represented by highly sophisticated counsel. Considering the six experts retained by Plaintiffs herein, and the small amount at issue ($69.99-$279.96), class is superior.

Also, a class here will not interrupt any individual cases, as none have been filed. Florida is an appropriate forum for the class action, as RTG is mostly based here, ████████████ ████████████. Tab 26, Maldonado Dep. at 31:22-25; 38:21-25. Finally, a class is not unmanageable, as the purchasers are readily identifiable. *In re Terazosin*, 220 F.R.D. at 700.

### C. The Court Should Certify the Slamming Class Under Rule 23(c)(4) and (5)

The slamming subclass could be certified as to the main liability issue under Rule 23(c)(4). Plaintiffs have assembled widespread evidence that "slamming" is a prevalent practice at RTG. ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████ Clementine Bender, a former sales associate from

Texas, ██████████████████████████████████████████████

█████████████████████████████████████████████████████████

Tab 18, Bender Dep. at 147:24-148:17. She also found numerous instances of the customer's

copy of the warranty certificate tossed in the garbage. Tab 34, Bender Retrieved Certificates;

██████████████████████████████████████████████

    Furthermore, ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████. Bender

avers that she was prodded to slam customers, and that her coworkers joked about it. Tab 19,

Bender Decl. at ¶¶ 4-8.

    Determining who was slammed "can be addressed later in the proceedings by means of a

special master, representative trials, or other means." *Beattie v. CenturyTel, Inc.*, 234 F.R.D. 160,

171 (E.D. Mich. 2006), *aff'd in part, remanded in part*, 511 F.3d 554 (6th Cir. 2007) (certifying

class where defendant misled customers through "slamming and cramming" charges on bill). If a

class jury found slamming a prevalent deceptive practice at RTG, Floridians who purchased at

RTG stores could present evidence in follow-on proceedings that they did not knowingly buy the

plans. If believed, those customers would be entitled to a full refund.

**V.    CONCLUSION**

    For the aforementioned reasons, the Court should grant Plaintiffs' motion to certify their

claims is as a class action and for any other relief deemed just and proper.

DATED: September 2, 2016

                                    Theodore J. Leopold (FL Bar No. 705608)
                                    Leslie M. Kroeger (FL Bar No. 989762)
                                    Diana L. Martin (FL Bar No. 624489)
                                    COHEN MILSTEIN SELLERS & TOLL PLLC
                                    2925 PGA Boulevard, Suite 200
                                    Palm Beach Gardens, FL  33410
                                    Telephone:  (561) 515-1400
                                    Facsimile:  (561) 515-1401
                                    tleopold@cohenmilstein.com
                                    lkroeger@cohenmilstein.com

dmartin@cohenmilstein.com

Douglas J. McNamara (pro hac vice)
Eric A. Kafka (pro hac vice)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue, NW
East Tower, 5th Floor
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
dmcnamara@cohenmilstein.com
ekafka@cohenmilstein.com

*Counsel for Plaintiffs*