IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 9:15-CV-81139-COHN/SELTZER

BENJAMIN HANKINSON, JAMES
GUERRA, JEANETTE GANDOLFO,
LISA PALMER, DONALD
ANDERSON, CATHERINE LONG, and
LISA PRIHODA, individually and on
behalf of others similarly situated,

        Plaintiffs,

vs.

R.T.G. FURNITURE CORP., d/b/a
Rooms To Go, RTG AMERICA, LLC,
THE JEFFREY SEAMAN 2009
ANNUITY TRUST, RTG FURNITURE
CORP. OF GEORGIA, d/b/a Rooms To
Go, ROOMS TO GO NORTH
CAROLINA CORP., d/b/a Rooms To
Go, RTG FURNITURE OF TEXAS,
L.P., d/b/a Rooms To Go, RTG TEXAS
HOLDINGS, INC., and R.T.G.
FURNITURE CORP. OF TEXAS

        Defendants.

_____

**DEFENDANTS' MOTION TO EXCLUDE
THE TESTIMONY OF CHRISTOPHER JACKMAN**

Defendants ("RTG"),[1] pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and its progeny, move to exclude the expert report and testimony of Christopher Jackman.

## INTRODUCTION

When plaintiffs filed this case, they initially alleged that RTG did not treat furniture that was sold with a ForceField fabric protection plan. They now admit that RTG does, in fact, apply the ForceField protectants, but they claim that furniture is not treated "professionally" – a word that is allegedly used in individual oral discussions with salespeople or appears on a warranty certificate that is provided to customers, if at all, only after they have already purchased the protection plan.

As part of their efforts to bolster their newly minted claim regarding the lack of "professional" treatment of their furniture, plaintiffs retained Christopher Jackman, an economist, to calculate the ratio of protectant RTG purchased to the amount supposedly "recommended" to treat the pieces of furniture sold with fabric and leather protection plans during each year of the relevant class periods. Plaintiffs rely on this ratio to assert that RTG purchased only a fraction of the protectant that would allegedly be "necessary" to apply to the furniture. ECF No. 114-1 at 10.

The lynchpin underlying Jackman's opinion is his assumption that there is, in fact, an amount of protectant that must be applied in order to effectively achieve food and beverage stain resistance. But there is no data in the record to support that assumption. Jackman has not performed any tests to determine the amount of protectant necessary to provide stain resistance. Instead, he relies solely on a document that is untested and unreliable, according to its source, and on the instruction of counsel, which is untethered to any evidence in the record.

To begin, Jackman (who has no experience in the furniture industry, let alone furniture protection plans) first divided the thousands of different types of furniture sold during the relevant periods into 25 categories. He then relied on a document posted on the ForceField manufacturer's website that includes "recommended" coverage amounts of fabric protector for

---

[1] Defendants use the acronym "RTG" in this brief solely for ease of reference. In fact, only three operational defendants – R.T.G. Furniture Corp., RTG Furniture Corp. of Georgia, and RTG Furniture of Texas, L.P. – offered protection plans to the proposed class members and applied protectant. The remaining defendants are non-operational entities that do not sell plans or apply protectant.

only 3 of those 25 categories of (fabric) furniture.  For the 22 other types of fabric furniture for which it is undisputed there are no coverage amounts recommended by the manufacturer, and for *all* leather furniture, Jackman relied solely on the instruction of plaintiffs' counsel for the "recommended" coverage amount.

Jackman's opinion regarding the ratio of protectant purchased to the supposedly "recommended" amount needed to treat the number of pieces sold must be excluded because, for 88% of his self-invented categories for fabric furniture and 100% of his categories for leather, he relied solely on the word of plaintiffs' counsel for the "recommended" amounts.  Of course, plaintiffs' counsel are hardly unbiased observers; they are seeking to be appointed class counsel and have a pecuniary interest in the result of this litigation.  To our knowledge, they do not intend to testify as fact witnesses and subject themselves to cross-examination.  Jackman also did not consider the wide range of different sizes of furniture within or between categories, and he did nothing to ensure consistency among the categories.  As a result, there are vast differences in the amount of fabric that would be treated with a given amount of protectant.  And, for the three categories of fabric furniture for which a document on the manufacturer's website identifies "recommended" coverage amounts, Jackman did nothing to test those recommendations, and he ignored that (a) the manufacturer has testified that those recommendations are not based on any testing and lack any reliable factual basis, and (b) the plaintiffs' own textile expert found that ForceField was effective if sprayed evenly, without even quantifying the amount sprayed.

Jackman was also asked to calculate the amount of protectant purchased by RTG per unit of furniture sold with a protection plan for each year of each class period.  Plaintiffs rely on this calculation to establish what they claim is the "average … amount of protectant that each piece of RTG furniture received."  ECF No. 114-1 at 10.  But that is not what Jackman calculated.  He expresses no opinion regarding the amount of protectant actually applied to a particular piece of furniture, and he admits that the amount of protectant purchased each year does not tell us how much was applied in the same period.  Moreover, plaintiffs cannot prove their own claims or the claims of putative class members using an average.  Jackman's calculation of an "average" is irrelevant to the issues in dispute, potentially confusing, and prejudicial to RTG.

## FACTUAL AND PROCEDURAL BACKGROUND

Currently, six plaintiffs seek to represent statewide classes of purchasers of ForceField protection plans for Florida, Georgia, and Texas.  ECF No. 86; ECF No. 114.  Furniture is

2

prepared for delivery to those states, and ForceField protectants are applied, at five distribution centers – in Lakeland, Florida; Pearl River, Louisiana; Suwanee, Georgia; Katy, Texas; and Arlington, Texas.[2]  Each distribution center purchases the fabric protectant and leather protectant in 55-gallon drums from Shield Industries.

Jackman was retained by plaintiffs to compile the sales data produced by RTG and attempt to compare, on an annual basis, the amount of ForceField product purchased from Shield Industries, to the amount of ForceField Protectant that "would have been recommended" to treat pieces of furniture sold with the ForceField Protection Plan during each class period. Declaration of Christopher Jackman ("Jackman Decl.)at ¶ 5, attached as Exhibit 2.  To do this analysis, Jackman divided the amount of leather or fabric ForceField protectant purchased by the amount of leather or fabric ForceField protectant "recommended" to determine the ratio of protectant purchased to protectant recommended.  Oct. 26, 2016 Deposition of Christopher Jackman ("Jackman dep.") 22, Exhibit 3.  He performed this calculation on an annual basis for each of the three states at issue.  For example, to find the ratio of protectant purchased to protectant recommended for fabric in Florida in 2011, Jackman performed the following calculation:

$$\frac{\text{(Table 5, protectant purchased)}}{\text{(Table 3, protectant recommended)}} = \text{(Table 7, Ratio of protectant purchased to protectant recommended)}$$

Jackman dep. at 22- 24.

To determine the numerator (the "protectant purchased"), Jackman reviewed purchase data from Shield Industries regarding RTG's annual purchases of fabric and leather protectant. Jackman Decl. ¶ 13.  Importantly, Jackman did not consider the amount of ForceField that may have been on hand at the distribution center at the beginning of each year, though.  Jackman dep. at 75:21-24.

To determine the denominator, that is, the protectant "recommended" for the sale of ForceField Protection Plans found in Table 3 of his declaration, Jackman multiplied the quantity of ForceField Protection Plans sold by the amount of ForceField Protectant supposedly

---

[2] Def. RTG Furniture Corp.'s Resp. & Obj. to Pls.' Second Set of Interrogatories (served June 22, 2016), at 9, attached as Exhibit 1.

3

"recommended" to treat each "furniture product category" (Table 2).  Jackman Decl. ¶ 12.

The "furniture product categories" set forth in Table 1 of Jackman's declaration are not categories that RTG uses to categorize furniture.  Instead, Jackman unilaterally developed those 25 furniture product categories based on his own analysis of ▓▓▓ unique product descriptions and ▓▓▓ unique stock keeping units ("SKU").  Jackman Decl. ¶ 8 & Table 1.  Neither Jackman nor his colleague who assisted with furniture product categorization had any experience working with or in the furniture industry; instead, they looked at the descriptions of product in the sales data produced by RTG and the website roomstogo.com.  Jackman dep. at 30-32.  While Jackman claimed that he attempted to be conservative in the assumptions he made when categorizing furniture, such as categorizing sectional sofas, which he thought would be larger than standard sized sofas, *see* Jackman Decl. ¶ 8 n.4, the very example he cites shows a failure to understand the data because sectional sofas are frequently sold as multiple pieces with separate SKUs, each of which is sold with fabric protection separately.  Jackman dep. at 35-41.

Jackman also did not consider the dimensions of any piece of furniture when categorizing them.  Jackman dep. at 32:11-17.  For example, Jackman placed a side chair with the dimensions of 39 x 19.5 x 18 in the same category as a swivel chair with dimensions of 58 x 58 x 38 in his category of "chair," which Jackman admits resulted in furniture of very different sizes being categorized together.  Jackman dep. at 33-35; DX 94 & 95, attached as Exhibit 4 and Exhibit 5, respectively.  The result of this random categorization is that Jackman's opinions rely on the view that they are all alike in terms of the amount of protectant that should be applied – when they are not.

While there are many flaws with Jackman's product categorization, the far more troubling issue in Jackman's analysis is the determination of "recommended" amounts of protectant required for the furniture product categories.  Jackman relies on the Technical Data Sheet (TDS) for ForceField Fabric Protector, available on Shield Industries' website, to provide recommended coverage amounts for only a few categories of furniture.  Jackman Decl. ¶ 9 & n.7.  He readily admits, however, that of his 25 furniture product categories, Shield's TDS only provides a recommended amount for *three* categories of fabric furniture: 16 ounces for sofas, 12 ounces for loveseats and 8 ounces for chairs.  Jackman Decl. ¶ 9; ForceField Fabric Protector TDS, DX 99, Exhibit 6.  He did nothing to test those recommendations, and neither did the manufacturer.  Jackman dep. at 46; Bilbro dep. at 51-52, 54.

4

For the 22 other of Jackman's furniture product categories, he "was instructed by Counsel for the plaintiffs to use the recommended coverage amounts included in Table 2"[3] of his declaration, set forth below:

Table 2
Summary of Recommended Coverage Amounts by Furniture Product Category

| Category | Fl. Oz. | Category | Fl. Oz. | Category | Fl. Oz. |
|---|---|---|---|---|---|
| Chair | 8 | Recliner | 8 | Sofa Bed | 12 |
| Chair Bed | 8 | Recliner w/ Ottoman | 16 | Sofa Click Clack | 16 |
| Chair w/ Ottoman | 16 | Sleeper | 12 | Sofa w/ Chaise | 16 |
| Chaise | 8 | Sleeper Chair | 8 | Sofa w/ Ottoman | 24 |
| Chaise w/ Ottoman | 16 | Sleeper Chaise | 8 | Stool | 8 |
| Console | 8 | Sleeper Loveseat | 12 | | |
| Corner/Wedge | 8 | Sleeper Ottoman | 8 | | |
| Loveseat | 12 | Sleeper Sofa | 16 | | |
| Loveseat w/ Chaise | 12 | Sleeper Sofa w/ Chaise | 16 | | |
| Ottoman | 8 | Sofa | 16 | | |

Source: Relevant Sales Data; ForceField Fabric TDS.

Jackman has done nothing to test the assumptions provided by counsel, however. Jackman dep. at 46-47. They are not the result of any document produced in this matter, nor were they tested by any other expert in this case. In other words, the only basis for the recommended amounts for 22 of the 25 types of furniture is the instructions provided by the plaintiffs' counsel.

At an even more fundamental level, there is no basis to assume that the recommended coverage amounts stated in Shield's TDS are in fact required for the ForceField fabric protectant to be effective. The president and representative of Shield Industries (which manufactures the ForceField protectants) testified that Shield has never tested the recommended amounts contained in the ForceField application instructions or any other aspect of those instructions. Deposition of Richard Bilbro ("Bilbro dep.") at 51, 54, 62, 73-76, attached as Exhibit 7. Instead, he believes that the recommended amounts, like the other information on the application instructions, were simply copied from another source, "[p]robably from competitors' literature 17 years ago, 12 years ago. I can't answer your question to be honest with you." *Id.* at 49:15-18.[4] In fact, Shield believes that its product will work if applied using a spray bottle to cover the

---

[3] Jackman Decl. ¶ 9.
[4] Thus, even according to plaintiffs' own expert, Dr. Meirowitz, Shield Industries' recommendations do not establish how much protectant should be applied to an item.

5

furniture in a fine mist.  *Id.* at 96:14-21.

Jackman was also instructed by counsel to use the same "recommended" amounts for leather protectant as for fabric protectant.  Jackman Decl. ¶ 10.  But, whereas the technical data sheet for fabric protectant at least provides some purported recommendation for three fabric furniture product categories, Jackman acknowledges that the technical data sheet for the ForceField Leather Protector does not included any recommended coverage amount for any leather furniture.  Jackman Decl. ¶ 10; Jackman dep. 51.  Instead, it only states "using a clean white cloth, apply small amounts of the protector to the leather surface with a rubbing motion and work the protector into the hyde. Can be sprayed on the surface, as well."  Jackman Depo. 50; Force Field Leather Protector TDS, DX 100, Exhibit 9.   Jackman admitted he could not point to any document to support the assumption he was asked to make that leather would require the same amount of protectant as fabric.  Jackman dep. at 51.

Jackman also calculated the "amount of ForceField protectant purchased by Rooms To Go per each unit of furniture sold with a ForceField protection plan" on an annual basis for each year during the Class Periods.  Jackman Decl. ¶ 17 & Table 6.  Again, Jackman did not take into account the amount of ForceField that may have been on hand at the beginning of each year.  Jackman dep. at 75.  Plaintiffs suggest that Jackman's calculation of the amount of protectant purchased per unit of furniture sold with a protection plan establishes the "average" amount of protectant that each piece of RTG furniture received.  ECF No. 114-1 at 10.  But, Jackman admits that he has no opinion regarding the amount of ForceField actually applied to any piece of furniture.  Jackman dep. at 21.  And, the calculation of this purported "average" does not take into account the vast differences between types and size of furniture reflected in the thousands of unique product descriptions and SKUs sold by RTG.

## STANDARD FOR ADMISSIBILITY OF EXPERT TESTIMONY

As "the party offering the expert," plaintiffs have the burden of laying the proper foundation for the admission of Jackman's testimony.  *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 at

---

Deposition of Randy Meirowitz ("Meirowitz dep.") at 77, attached as Exhibit 8 ("So it's both the case that a good scientist and a good manufacturer would not assume that the suggested amount is the correct amount without testing it?  A. I think that's fair."); *id*. ("Q. And just to be clear, you don't want to assume without testing that the suggested amount is the correct amount? A. I would not, correct.").

n.10 (1993)). Plaintiffs must demonstrate admissibility "by a preponderance of the evidence." *Id.* In applying Rule 702, "district courts must act as 'gatekeepers' which admit expert testimony only if it is both reliable and relevant." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005) (citing *Daubert*, 509 U.S. at 589). "District courts are charged with this gatekeeping function to ensure that speculative, unreliable expert testimony does not reach the jury under the mantle of reliability that accompanies the appellation 'expert testimony.'" *Id.* (internal quotation marks omitted). To meet this obligation, courts "must engage in a rigorous inquiry to determine whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable ...; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *Id.* at 1291–92 (internal quotation marks omitted). In addition, even if proposed expert testimony is admissible under Rule 702, that evidence may be excluded if it is irrelevant or if "its probative value is substantially outweighed by a danger of ... unfair prejudice, confusing the issues, [or] misleading the jury." Fed. R. Evid. 403; *accord Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1309–10 (11th Cir. 1999).

The Eleventh Circuit has held that "a district court must conclusively rule on any challenge to the expert's qualifications or submissions prior to ruling on a class certification motion." *Sher v. Raytheon*, 419 F. App'x 887, 890 (11th Cir. 2011). This includes "determin[ing] the reliability of the expert's experience and training as well as the methodology used" and "resolv[ing] any challenge to the reliability of information provided by the expert." *Id.* Jackman's testimony cannot satisfy this rigorous standard, for several reasons.

## ARGUMENT

**I.  Jackman's opinion regarding the ratio of ForceField purchased to protectant "recommended" is not reliable because it is based on assumptions with no factual basis.**

While the simple mathematical calculations Jackman performs to determine the ratio of protectant purchased to protectant recommended are correct, the inputs into the equation are faulty, rendering his opinion unreliable. Pursuant to Rule 702 of the Federal Rules of Evidence and the "reliability" step of the *Daubert* analysis, the Court must determine whether Jackman's testimony is sufficiently reliable. Rule 702 requires that: "(1) *the testimony is based on sufficient facts or data*, (2) the testimony is the product of reliable principles and methods, and (3) the

7

witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702 (emphasis added).

Courts may also review the factual basis of an expert's opinion under Rule 703 of the Federal Rules of Evidence. Under Rule 703, expert opinions based on otherwise inadmissible facts and data are to be admitted only if the facts and data are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject ...." Fed. R. Evid. 703. Under Rule 703, courts have held that "[i]f the underlying data are so lacking in probative force and reliability that no reasonable expert could base an opinion on them, an opinion which rests entirely upon them must be excluded." *Ellipsis, Inc. v. The Color Works, Inc.,* 428 F. Supp. 2d 752, 760 (W.D. Tenn. 2006) (*citing Mohney v. U.S. Hockey, Inc.*, 300 F. Supp. 2d 556, 565 (N.D. Ohio 2004).

Courts have applied both Rules 702 and 703 to exclude expert opinions when the factual assumptions relied upon are flawed or unsupported. *See e.g., Coffey v. Dowley Mfg., Inc.*, 89 Fed. Appx. 927, 931-32 (6th Cir. 2003) (affirming exclusion of expert because expert's analysis would be inaccurate if he used inaccurate data in his formula and noted that that the expert failed to confirm his estimates in any way). On facts very similar to the ones before the Court, the court in *Ellipsis, Inc. v. The Color Works, Inc.,* excluded the testimony of an expert because the expert's report contained several flawed factual assumptions that undermined the reliability of the entire report. 428 F. Supp. 2d at 761. In *Ellipsis*, the plaintiff offered an expert to opine on lost profits and damages allegedly resulting from the sale of replaceable camouflaged cellular telephone face plates. The court excluded the opinion because the expert made a number of faulty assumptions that undermined the reliability of the report – including that he relied exclusively on data provided by the plaintiff, failed to verify information from a website, and predicted growth in sales of one product based on growth of sales for another product, without a reliable basis for doing so. *See Ellipsis, Inc.*, 428 F. Supp. 2d at 761.

Like the expert in *Ellipsis*, Jackman's opinion is based on unreliable data and assumptions, and he compounds the problem by extrapolating from those data without any reliable basis for doing so. First, Jackman and his colleague categorized several thousand product descriptions and unique SKUs into 25 "furniture product categories," despite that neither of them had any experience in the furniture industry. Though Jackman claimed he attempted to be conservative in his assumptions (e.g., by categorizing what he perceived to be larger sectional

8

sofas as standard-size sofas), the example he gives demonstrates that his assumptions were not reliable, as he did not understand that sectionals are sold as multiple pieces, each of which is sold with fabric protection separately. Jackman dep. at 35-41.

More fundamentally, though, there is no reliable basis for Jackman to determine the "recommended" amounts of ForceField for each furniture category. First, Jackman relied on the Shield Industries Technical Data Sheet for fabric protectant to provide the recommended protectant amounts for three of his 25 furniture product categories (sofas, loveseats, and chairs). Jackman did not test the recommendations for sofas, loveseats, or chairs, nor is he aware of any other testing that anyone else has done to evaluate them. Jackman dep. at 46. In fact, Shield's recommended coverage amounts have never been tested or verified either by Shield Industries or any expert in this matter. Bilbro dep. at 51-52, 54. Rather than recommending any particular amount, Shield's president testified that Force Field is effective if a handheld spray bottle is used to cover the furniture in a fine mist and that more Force Field is not necessarily more effective. *Id.* at 96:18-23; 97:18-98:1. And, plaintiffs' own textile chemistry expert, Dr. Randy Meirowitz, applied ForceField protectant by evenly covering fabric—*not* by using any manufacturer-recommended amount–and achieved stain resistance. Meirowitz dep. at 105-06. Meirowitz further testified that the amount of protectant required to achieve stain resistance would vary from item to item because of differences in fabric. Meirowitz dep. at 164-65. Thus, according to plaintiffs own textile expert, any "recommended" amount based on furniture category (and not fabric type) is misplaced.

Second, Jackman relied on the instructions of plaintiffs' counsel for the recommended protectant amounts for the other 22 of 25 fabric furniture product categories. Jackman Decl. ¶ 9. Jackman has not done anything to test those amounts. Jackman dep. 46-47. They are not the result of any document produced in this matter, nor were they tested by any other expert in this case. There is simply no evidentiary basis for plaintiffs' counsel (and thus Jackman) to assume that the same recommended coverage amount of 8 ounces for a chair would also hold true for a chaise or an ottoman or a stool. As discussed in part II below, those assumptions do not hold up to real-world testing.

Finally, Jackman relied on the instructions of plaintiffs' counsel for *all* of the recommended protectant amounts for leather furniture. Jackman Decl. ¶ 10. But, plaintiffs point to no evidence that Shield provided a recommended amount of protectant for *any* furniture

9

category with leather upholstery. Jackman admitted that he did not review a single document to support the assumption he was asked to make that leather would require the same amount of protectant as fabric. Jackman dep. 51. Moreover, Plaintiffs' textile chemistry expert testified that the process for applying a stain resistant polymer to leather is different from applying it to fabric. Meirowitz dep. at 37. The Force Field fabric and leather products are so different that, having examined only the fabric product, Dr. Meirowitz readily agreed that he could offer no opinions on the leather product. *Id.* at 80:7-20.

All of these assumptions are an integral part of Jackman's opinions, as they act as the denominator in his equation to find the ratio of protectant purchased to protectant recommended. Inaccurate data that is correctly used in a formula will produce an inaccurate result. *See e.g., Children's Broadcasting Corp. v. Walt Disney Co.*, 245 F.3d 1008, 1018 (8th Cir. 2001) (holding district court properly excluded testimony of expert on damages when his testimony was based on faulty assumptions). Thus, the Court should exclude all of Jackman's opinions regarding the ratio of protectant purchased to the amount supposedly "recommended."

**II.     The assumptions regarding coverage amounts do not stand up to "real world" testing and lead to bizarre results.**

"[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *Michigan Millers Mut. Ins. Corp. v. Benfield*, 140 F.3d 915, 921 (11th Cir. 1998) (quoting *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146. Thus, an expert's testimony should be excluded when the expert's assumptions do not stand up to "real world" testing. *See, e.g., Finestone v. Florida Power & Light Co.,* 2006 WL 267330, at *11, 12 (S.D. Fla. Jan. 6, 2006) (Cohn, J.) (excluding testimony of experts whose assumptions "cannot stand next to the actual data"). The assumptions Jackman made at counsel's instruction cannot stand up when tested against actual data produced in this litigation.

Jackman starts from the premise that the manufacturer's recommended coverage amounts should apply where they are stated in the Shield TDS for fabric protector – that is, 16 oz. for sofas, 12 oz. for loveseats, and 8 oz. for chairs. Jackman Decl. ¶ 9. Shield's TDS, however, does not say anything about the size of the pieces for which these amounts are recommended. Jackman did not consider the dimensions of any piece of furniture when categorizing them.

Jackman dep. at 32.  As a result, the size of each piece of furniture in each of his categories may vary dramatically.  For example, the category of "chair" includes pieces ranging from a side chair with dimensions of 39 x 19.5 x 18, to a swivel chair approximately one and a half times the size (58 x 58 x 38).  Jackman dep. at 33-35.  There is no reasonable basis to conclude that 8 ounces of protectant would be required for every variety of chair sold by RTG.

Even if we were to accept the "recommended" coverage amounts from Shield's TDS for fabric sofas, loveseats, and chairs, however, the assumptions that counsel instructed Jackman to make with respect to 22 other categories of furniture have no principled basis and are unsupported by any evidence or common sense.  The breadth and variety of furniture types and sizes for which plaintiffs' counsel instructed Jackman to assume 8 ounces was the "recommended" amount of protectant demonstrates the absurdity of Jackman's assumptions.  Whereas the TDS for fabric protectant provides a recommended protectant amount of 8 ounces only for a "chair," plaintiffs' counsel also instructed Jackman to assume that 8 ounces was the proper amount of protectant for 10 other categories:  chair bed, chaise, console, corner/wedge, ottoman, recliner, sleeper chair, sleeper chaise, sleeper ottoman, and stool.  Jackman Decl. ¶ 9 & Table 2.  Jackman accepted counsel's instructions at face value and did not consider, for example, whether a sofa (for which the TDS recommends 16 ounces) is double the size of an ottoman or a stool (for both of which counsel recommended 8 ounces).  Jackman dep. at 47.

Most importantly, Jackman did nothing to consider whether the "recommended" coverage amounts supplied by plaintiffs' counsel would result in a consistent amount of fabric being treated with a given amount of protectant.[5]  Jackman dep. at 52 ("Q: And did you do any analysis to determine that any one of these categories would have consistent number of square foot per ounces in the other category?  A: No.").  An analysis of these attorney-generated assumptions shows that they result in a large percentage difference in the number of ounces per square foot of upholstered surface that would be applied to different furniture product categories for which plaintiffs' counsel instructed Jackman to use the same "recommended" amount of protectant.  For example, during his deposition, Jackman was asked to compare a stool that plaintiffs' counsel told him would require 8 ounces of protectant to a cocktail ottoman that he

---

[5] Incredibly, Jackman testified that he has no opinion whether the same type of material (fabric or leather) should have the same amount of protectant applied per square foot, even after being confronted with large variances.  Jackman dep. at 54,71.

11

also was instructed to assume would require 8 ounces of protectant. Jackman determined that the stool had approximately 1.56 square feet of fabric to be treated, so applying 8 ounces of protectant would result in every ounce of protectant only having to treat .195 square feet of the stool. Jackman dep. at 58-64. The cocktail ottoman was much larger, with approximately 29.75 square feet of fabric to be treated, and, therefore, applying 8 ounces of protectant would result in every ounce of protectant having to treat 3.72 square foot of the cocktail ottoman. Jackman dep. 66-68. In this example, the instructions of plaintiffs' counsel results in a difference of approximately *19 times* the amount of protectant being applied to each square foot of upholstered fabric for a stool and a cocktail ottoman. Jackman dep. 70-71.

Before his deposition, Jackman made no attempt to ensure that plaintiffs' instructions would result in the same type of fabric receiving the same amount of protectant if used on furniture in different product categories. Jackman dep. at 70. As demonstrated in his deposition, they do not. Because the "recommended" coverage amounts supplied by plaintiffs' counsel would result in dramatically different amounts of protectant being applied to a square foot of fabric in different categories, these "recommended" amounts are unreliable inputs for Jackman's calculations. And, since Jackman relied on untested assumptions that are not reliable, his opinions should be excluded.

**III.   Jackman's opinion regarding the amount of protectant purchased per unit of furniture sold with a protection plan does not "fit" the case.**

Rule 702 requires "an appropriate 'fit' with respect to the offered opinion and the facts of the case." *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004) (citing *Daubert*, 509 U.S. at 591). The testimony must also "fit" the issue to be determined: "if an expert opinion does not have a valid scientific connection to the pertinent inquiry, it should be excluded because there is no fit." *Boca Raton Cmty. Hosp. v. Tenet Health Care*, 582 F. 3d 1227, 1232 (11th Cir. 2009) (affirming exclusion of expert opinion that did not "fit" plaintiffs' theory of liability).

Here, plaintiffs are proceeding under a theory that requires them to prove a supposedly common representation – that RTG would "professionally" treat their furniture (notwithstanding that this supposedly common representation was made in a document that was provided to customers *after* the sale, if at all). In other words, plaintiffs need to prove how their furniture (and the furniture of every other class member) was actually treated. Jackman admits, however, that he does not provide any opinion regarding the amount of ForceField actually applied to any

piece of furniture.  Jackman dep. at 21.

Plaintiffs assert that Jackman's calculation of the amount of protectant purchased per unit of furniture sold with a protection plan (shown in Table 6 of his report) establishes the "average" amount of protectant that each piece of RTG furniture received.  ECF No. 114-1 at 10.  Jackman's calculation does not fit that bill, though.  First, the amount of protectant purchased by a distribution center during a year does not tell us how much protectant was actually applied during that year, because Jackman did not account for the amount of protectant on hand at the beginning of each year.  Jackman dep. at 75.  He admitted, for instance, that if a distribution center made no purchases of leather protectant for a year, that does not mean that no leather protectant was applied during that period; it "simply [means] that there wasn't the – the leather ForceField protectant purchased."  *Id.*

Even if, however, the purchase of the ForceField protectant during a given year were somehow an adequate proxy for the amount actually applied by a distribution center during that year, that would not tell us anything about how much protectant was applied to any particular piece of furniture.  No plaintiff can establish his or her claim based on this average.  RTG did not apply a statistical average of protectant to the furniture.  They applied different amounts to different items, as furniture comes in many shapes and sizes, and employees are trained to "provide even coverage" over all upholstered portions of furniture.[6]  And, according to plaintiffs, the distribution centers would "skip some products if 'too busy.'"  Second Amended Complaint (ECF No. 86) ¶ 41.  If an employee was supposed to treat two chairs, but skipped one, then one chair would be far below the average (zero) and the other could be well above the average.  Jackman's opinion tells us nothing about which was which.  The Supreme Court has made clear that this type of "trial by formula" is not permissible.  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2561 (2011).

Jackman's opinion regarding the amount of protectant purchased per unit of furniture sold with a protection plan therefore should be excluded because does not advance an issue in dispute.  It would also be unduly prejudicial to RTG to allow Jackman to testify regarding the supposed "average" amount of protectant RTG purchased, as a jury may be confused into thinking that the average was the amount actually applied to each piece of furniture.

---

[6] Def's Resp. & Objections to Pl's. First Set of Interrogatories, Resp. No. 7, at 34, attached as Exhibit 10.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court enter an Order striking the Declaration of Christopher Jackman and excluding him from testifying in this matter.

## RULE 7.1 CERTIFICATE OF GOOD FAITH CONFERENCE

Pursuant to Local Rule 7.1(a)(3)(A), I hereby certify that counsel for the movant has conferred with all parties or non-parties who may be affected by the relief sought in this motion in a good faith effort to resolve the issues but has been unable to resolve the issues.

                                                          s/Jamie Zysk Isani
                                                               Jamie Zysk Isani

Dated: December 5, 2016                   Respectfully submitted,

                                          By:   s/Jamie Zysk Isani
                                                  Jamie Zysk Isani (Florida Bar No. 728861)
                                                  HUNTON & WILLIAMS LLP
                                                  1111 Brickell Avenue, Suite 2500
                                                  Miami, Florida 33131
                                                  Telephone: (305) 810-2500
                                                  Facsimile: (305) 810-1675
                                                  jisani@hunton.com

                                                  Walfrido J. Martinez (Florida Bar No. 917930)
                                                  HUNTON & WILLIAMS LLP
                                                  200 Park Avenue
                                                  New York, New York  10166
                                                  Telephone: (212) 309-1316
                                                  Facsimile: (212) 309-1100
                                                  wmartinez@hunton.com

                                                  Randi Engel Schnell (*pro hac vice*)
                                                  Frank M. Lowrey IV (*pro hac vice*)
                                                  Joshua F. Thorpe (*pro hac vice*)
                                                  BONDURANT MIXSON & ELMORE LLP
                                                  One Atlantic Center
                                                  1201 West Peachtree Street NW, Suite 3900
                                                  Atlanta, GA 30309
                                                  Telephone: (404) 881-4100
                                                  Facsimile (404) 881-4111

        lowrey@bmelaw.com
        schnell@bmelaw.com
        thorpe@bmelaw.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on December 5, 2016 a true and correct copy of the foregoing was served by transmission of Notice of Electronic Filing generated by CM/ECF on all counsel or parties of record on the Service List below.


s/Jamie Z. Isani
Jamie Zysk Isani

## SERVICE LIST

Theodore J. Leopold
Leslie M. Kroeger
Diana L. Martin
**COHEN MILSTEIN SELLERS & TOLL PLLC**
2925 PGA Boulevard, Suite 200
Palm Beach Gardens, FL  33410
Telephone:  (561) 515-1400
Facsimile:   (561) 515-1401
tleopold@cohenmilstein.com
lkroeger@cohenmilstein.com
dmartin@cohenmilstein.com
lcuomo@cohenmilstein.com
eriley@cohenmilstein.com

Douglas J. McNamara
Eric A. Kafka
Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Ste. 500
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
dmcnamara@cohenmilstein.com
ekafka@cohenmilstein.com

*Attorneys for Plaintiffs*