# EXHIBIT 3

**TO DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF CHRISTOPHER JACKMAN**

Page 1

```
 1              UNITED STATES DISTRICT COURT
                 FOR THE SOUTHERN OF FLORIDA
 2

 3   _____
                                       :
 4   BENJAMIN HANKINSON, et al.,:
                                       :
 5             Plaintiff,       :
                                       :
 6        v.                    : Civil Action No.
                                : 9:15-CV-81139-COHN/
 7   R.T.G. FURNITURE CORP.     : SELTZER
     d/b/a ROOMS TO GO,         :
 8   RTG FURNITURE OF TEXAS,    :
     L.P., et al.,              :
 9                                     :
               Defendant.       :
10   _____:

11

12            Wednesday, October 26, 2016

13

14        Video Deposition of CHRISTOPHER JACKMAN,

15   taken at the Law Offices of Cohen Milstein

16   Sellers & Toll PLLC, 1100 New York Avenue,

17   NW, Suite 500, Washington, D.C., beginning at

18   10:13 a.m., before Ryan K. Black, a Registered

19   Professional Reporter, Certified Livenote

20   Reporter and Notary Public in and for District

21   of Columbia.

22

23

24

25
```

Page 21

1        Q.   Okay.  Now, if I understand

2   correctly, in Table 7 -- or in Paragraph 7, you

3   were talking about the difference between the

4   amount of ForceField that was purchased versus

5   the recommended amounts, but you're not making

6   any opinion as to the amount of ForceField

7   actually applied to any piece of furniture;

8   is that correct?

9        A.   No -- oh, I'm sorry.  That is correct.

10  I am not -- well, why don't we start -- start

11  again.

12       Q.   So -- is -- is it correct that you

13  do not have an opinion as to the amount of

14  ForceField actually applied to any piece of

15  furniture?

16       A.   That is correct.  I don't have any

17  opinion to that effect.

18       Q.   Okay.  And you, in fact, did not

19  review any documents or data related to the

20  amount of protectant that was actually applied

21  to any piece of furniture?

22       A.   That's correct.

23       Q.   Okay.  So I want to turn your

24  attention to Table 7, which is on paragraph

25  -- or, I'm sorry, Page 12.

1      A.    Sure.

2      Q.    So at a high level, can you tell

3  us the equation that went into producing the

4  information that is in Table 7?

5      A.    Sure.  It has two parts.  So

6  the first part is determining the amount

7  of ForceField protectant that would have been

8  recommended to treat the furniture that was sold

9  with ForceField protection plans, which is part

10  of what I'm calling the relevant sales data.

11  So -- and I don't know if this constitutes high

12  level for you, but I calculated those amounts

13  for each year in the -- in the rel -- for each

14  relevant year for each state for each material

15  type.

16          And then the second component of

17  that calculation is the amount of ForceField

18  protectant purchased by Rooms To Go from Shield.

19  And, again, earlier in the declaration I detail

20  how I went about determining those amounts.  But

21  once I had those two figures for each relevant

22  year, state and material type, I divided the

23  amount of protectant purchased by the amount

24  of protection that would have been required to

25  treat the furniture sold in those years with a

1    protection plan, and that's what these perc --

2    percentages represent.

3        Q.    So is the amount of protectant

4    purchased the information that is provided in

5    Table 5 which is on Page 10?

6        A.    Yes.

7        Q.    Okay.  And the protectant recommended

8    is on Table 3 on Page 8; is that correct?

9        A.    That's correct.

10       Q.    Okay.  So just to make sure we're

11   on -- on the same page, if we look at Florida

12   2011 as an example, --

13       A.    Yes.

1    

   

   

   

5       Q.   Right.

6       A.   -- in 2001 in fabric.  Yes, so,

7 essentially, you're taking the -- for a given

8 year, state and material type, you're taking the

9 number in Table 5 and dividing that by the

10 number in Table 3.

11       Q.   Okay.  And are you aware of any errors

12 or -- in your calculations in the report?

13       A.   No, I'm not.

14       Q.   Was there a reason that leather was

15 calculated separately than fabric?

16       A.   I don't know that, other -- other than

17 the fact that it's a separate material type.

18       Q.   So were you given any instructions to

19 calculate the two materials separately?

20       A.   Yes, sir.

21       Q.   And that was a calcu -- an instruction

22 that was given to you by counsel?

23       A.   By counsel, yes.

24       Q.   Could you have calculated fabric and

25 leather together?

```
 1            Have you or do you plan to re-run any
 2    calculations?
 3        A.    At this point, no, I do not.
 4        Q.    Okay.  So do you anticipate spending
 5    any -- other than any testimony you might give,
 6    do you anticipate spending any further time
 7    working on this matter?
 8        A.    Not at this time.
 9        Q.    Now, it's my understanding that when
10    you were with the Nathan Group you were charging
11    $350 an hour for the work that were done -- had
12    done; is that correct?
13        A.    380.
14        Q.    380.
15            And is that also for deposition time
16    and any trial time?
17        A.    Correct.
18        Q.    Will your rate be the same now that
19    you're with the Monument Economics Group?
20        A.    Yes.
21        Q.    Okay.
22        A.    For this matter.
23        Q.    For this matter.  Of course.
24            So we talked a bit about the product
25    categorizations.  I want to refer you to Table
```

1   1, which is found on Page 5 of your declaration.

2   And are -- and just to be clear, so are these

3   the product categories that you were referring

4   to previously?

5        A.   Correct.

6        Q.   Okay.  And -- and there appear to be

7   25 different categories; is -- is that correct?

8        A.   That's correct.  And maybe I'll

9   clarify.  So these are the categories that we,

10  ultimately, used in the declaration, but there

11  were a number of additional categories that we

12  had come up with that are listed in Footnote 5

13  that we excluded from the analysis.

14       Q.   Fair enough.

15            How do you divide the -- the furniture

16  into these 25 different categories?

17       A.   Using my best judgment, we went

18  through the product categories that were in the

19  RTG data, and, as you said earlier, there were

20  over 3,500 of them.  And using our best

21  judgment, this is what I came up with to -- to

22  limit it to these 25 here.

23       Q.   So you looked at, like, the

24  descriptions and the data?

25       A.   Yes.

1       Q.    That's right?

2       A.    Mm-hmm.

3       Q.    Did you use any other criteria or any

4   other source of information?

5       A.    Well, if something in the data -- if

6   the description in the data wasn't clear, we

7   would attempt to search for that product on

8   the RTG website, and we were able to verify the

9   product SKU on the website.  And so that -- that

10  guided our analysis and our categorization.

11      Q.    As part of your categorization of the

12  furniture, did you look at the dimensions of any

13  piece of furniture?

14      A.    You mean, like, length, width, height,

15  that sort of thing?

16      Q.    Yes, sir.

17      A.    No.

18      Q.    Are you aware that Rooms To Go

19  produced information to the plaintiffs in

20  this case, which -- which provided information

21  on the dimensions of pieces of furniture?

22      A.    No, I'm not aware of that.

23      Q.    Would that have been useful to you in

24  accurately categorizing the pieces of furniture?

25            MR. MCNAMARA:  Objection to form.

Page 33

1          THE WITNESS:  No.

2  BY MR. LEE:

3      Q.   Why is that?

4      A.   Well, for the categ -- because I

5  was going off of the names, I -- I didn't

6  create a dimension -- a dimension aspect to the

7  categorizations, so I don't -- I don't see that

8  that would have changed my categorizations.

9      Q.   Are you aware that pieces of furniture

10 in the same category can greatly differ in size?

11     A.   Yes.

12     Q.   So, for example --

13          MR. LEE:  Well, let's mark as Exhibit

14 94 -- so as Exhibit 94, we'll mark a document

15 that's Bates stamped RTG0001927, which is a

16 merchandise information sheet.

17          (Deposition Exhibit No. 94, a document

18 Bates Numbered RTG0001927, a merchandise

19 information sheet, was marked.)

20          THE WITNESS:  Thank you.

21          THE REPORTER:  You're welcome.

22          MR. MCNAMARA:  Thank you.

23          MR. LEE:  And then as Exhibit 95

24 we'll mark RTG0001626, which is a merchandise

25 information seat sheet for a Lavinia Terrace.

1        (Deposition Exhibit No. 95, a document

2   Bates Numbered RTG0001626, a merchandise

3   information seat sheet for a Lavinia Terrace,

4   was marked.)

5            THE WITNESS:  Thank you.

6            THE REPORTER:  You're welcome.

7   BY MR. LEE:

8      Q.   And on Exhibit 94, I want to

9   specifically draw your attention to the

10  side chair, which is SKU 42358881.

11           Do you see that -- that there?

12     A.   Yes.

13     Q.   Okay.  And could you tell us, what are

14  the dimensions -- or, first of all, what type of

15  furniture is being described by that SKU number?

16     A.   It says side chair.

17     Q.   And -- and what are the dimensions of

18  that piece of furniture?

19     A.   Thirty-nine inches by 19-and-a-half

20  inches by 18 inches.

21     Q.   Okay.  And next I'd like you to look

22  at Exhibit 95 and SKU Number 1230991.  What

23  piece of furniture is categorized by that SKU

24  number?

25     A.   It's a swivel chair.

1     Q.   And what are the dimensions of that

2    piece of the furniture?

3     A.   Fifty-eight -- doesn't give -- I'm

4    just going to assume it's inches, 58 inches by

5    58 inches by 38 inches.

6     Q.   So you would agree that this swivel

7    chair and side chair greatly differ in size?

8          MR. MCNAMARA:  Objection to form.

9          You can answer.

10         THE WITNESS:  Based on these

11   dimensions, that's correct.

12   BY MR. LEE:

13    Q.   In your product categorization,

14   would you have placed both of these pieces of

15   furniture into the same category as a chair?

16    A.   Most likely.

17    Q.   Okay.  And when talking about

18   the categorization of furniture you made,

19   in Footnote 4, which is on the bottom of Page 4,

20   you state that, in doing so, I attempted to make

21   conservative assumptions whenever necessary; for

22   example, sectional sofas are typically

23   larger than standard-sized sofas and would,

24   therefore, likely require more ForceField

25   protectant than a standard-sized sofa; however,

1  for my purposes of my calculations, sectional

2  sofas have been included in the sofa product

3  category.

4  　　　　Did I read that accurately?

5  　　A.　Yes.

6  　　Q.　What -- what is the statement that

7  sectionals -- or what is the statement based

8  upon?

9  　　A.　It's based upon my knowledge of

10  sectional sofas, that sectional sofas usually

11  have a -- you know, an angle to them, so it

12  would be more than a traditional sized sofa.

13  And so given that additional, I guess you could

14  call it surface area on the sectional sofa, it

15  would likely require more protectant.  And

16  so -- but what I tried to do was, if it was

17  something that would have fallen into that kind

18  of category, I would -- I placed it in the sofa

19  category, or I tried to place it in the smaller

20  category whenever possible.

21  　　Q.　Do you know how Rooms To Go defines a

22  sectional sofa?

23  　　A.　No.

24  　　Q.　Are you aware that there are pieces of

25  a sectional sofa that are sold separately, with

```
 1    separate SKUs?

 2         A.    No.

 3              MR. LEE:  I'm going to go ahead and

 4    mark just as an example -- we'll mark this as

 5    Exhibit 96.

 6              (Deposition Exhibit No. 96, an excerpt

 7    of Mr. Jackman's data from SAS that refers to

 8    several pieces of furniture, was marked.)

 9              MR. LEE:  And this is just an excerpt

10    of the -- your data from SAS that refers to a

11    couple of pieces of furniture.  I'm going to

12    provide you the MIS sheets so that we could

13    link the SKUs up to the actual sales data.

14              So as Exhibit 97 we're going to mark

15    RTG0002134, which is an MIS sheet relating to a

16    sectional sofa, with a SKU

17    Number 12109268 and 12209260.

18              (Deposition Exhibit No. 97, an MIS

19    sheet relating to a sectional sofa, with a SKU

20    Number 12109268 and 12209260, was marked.)

21              THE WITNESS:  Thank you.

22              THE REPORTER:  You're welcome.

23    BY MR. LEE:

24         Q.    Okay.  And could you look at

25    Exhibit 96, which is the information I've
```

1    prepared -- I've represented as a excerpt of

2    data from -- from your SAS calculations, and

3    do you see in that excerpted data SKU 121092628?

4         A.   Yes.

5         Q.   And it appears that it is a LFS [sic]

6    section.  Is that how it was described in the

7    data?

8         A.   An LAF section?

9         Q.   Right.

10        A.   That's correct.

11        Q.   And -- and how many quantities of that

12   sofa appear to be sold?

13        A.   It was a net quantity of 35.

14        Q.   And if you look at 12209260, could you

15   please read the description there?

16        A.   Would you repeat the SKU?

17        Q.   12209260.

18        A.   RAF section.

19        Q.   Okay.  And if you look at Exhibit 97,

20   does it contain both of those two SKUs?

21        A.   Yes, it appears to.

22        Q.   And do those two SKUs appear to be

23   -- I'm sorry.  Do those two SKUs together appear

24   to make up one sectional sofa?

25             MR. MCNAMARA:  Objection to form.

```
 1              THE WITNESS:  I -- I'm not sure
 2    if that's true.  Below I guess is what
 3    you're referring to, there's this picture of a
 4    sectional sofa.  It has a different SKU number
 5    than the two, or it appears to have a different
 6    SKU number than the two above it.  So I'm not
 7    certain if that's the case or not.
 8    BY MR. LEE:
 9         Q.   Is it described as a two-piece
10    sectional sofa?
11         A.   Yes.
12              MR. MCNAMARA:  Objection to form.
13              What is described as a two-piece
14    sectional sofa?
15              MR. LEE:  Is SKU number -- sorry.
16    Thank you, Doug.
17    BY MR. LEE:
18         Q.   Is SKU Number 121092 -- or, sorry,
19    1210926P described as a two-piece sectional?
20         A.   Yes.
21         Q.   And are the two pieces LAF sect and
22    RAF sect?
23         A.   Yes.
24         Q.   Are those the two descriptions in SKU
25    Numbers 12109268 and 12209260?
```

1          MR. MCNAMARA:  Objection to form.

2          THE WITNESS:  Yes.

3          MR. LEE:  Okay.  We'll also go ahead

4     and mark as Exhibit 98.

5          (Deposition Exhibit No. 98, a document

6     Bates Numbered RT00002161, was marked.)

7          MR. MCNAMARA:  Thank you.

8     BY MR. LEE:

9     Q.    Okay.  There I'd like you to look at

10    SKU Number 12107149, and what's the description

11    there?

12    A.    RAF sectional.

13    Q.    And SKU 12207141?

14    A.    LAF sectional.

15    Q.    Okay.  And if we look back at Exhibit

16    96, are the SKU numbers that are in Exhibit 98

17    present in Exhibit 96?

18    A.    Two of the three are, yes.

19    Q.    And, specifically, the RAF sectional

20    and the LAF sectional, are those two SKUs from

21    98 present in 96?

22    A.    Yes.

Page 41

4     Q.    Okay.  Next I would like to talk

5   to you about Table 2, which is the title, The

6   Summary of Recommended Coverage Amounts by

7   Furniture Product Category.

8     A.    Okay.

9     Q.    Okay.  Now, is it correct for the 25

10   categories of furniture identified in Table 2

11   you relied on the shield technical data sheet

12   for the amount used for sofas, love seats and

13   chairs?

14     A.    Can you rephrase that?  You said the

15   25 --

16     Q.    I'm sorry.

17     A.    -- and that was when you -- you

18   mentioned --

19     Q.    I'm sorry.  Fair enough.  Okay.

20           So in Table 2 there are 25 categories

21   of furniture, --

22     A.    Correct.

23     Q.    -- and each one of those categories

24   has a recommended coverage amount associated

25   with it.

Page 46

1  tested the recommendations that we just referred

2  to in the document?

3       A.   I'm sorry.  Can you rephrase?

4       Q.   Sorry.  Do you know if Shield

5  Industries tested the recommendations for

6  the coverage amounts for sofas, love seats or

7  chairs?

8       A.   Would you clarify that, please?

9       Q.   Do you know if Shield Industries did

10  any testing to make sure that the recommended

11  amounts for sofas, love seats or chairs that are

12  found in Exhibits 99 and Billbro 7 were -- were

13  -- were tested in any way?

14       A.   No, I do not.

15       Q.   Did you do anything to test the

16  recommendations that were the -- I'm sorry.

17  Strike that.

18            Did you do anything to test

19  the recommendations found in Billbro 7 and

20  Exhibit 99 for sofas, love seats and chairs?

21       A.   No.

22       Q.   Are you aware of any testing that

23  anyone else has done?

24       A.   No.

25       Q.   And I think we established for

Page 47

```
 1    categories other than sofas, love seats and
 2    chairs you used the amounts as instructed by
 3    counsel.
 4              Did you do anything to test those
 5    instructed amounts?
 6         A.   No.
 7         Q.   So looking specifically at a
 8    chair -- I'm sorry.  Looking specifically at a
 9    sofa, the recommended amount of ForceField to
10    be used there is 16 ounces; is that correct?
11         A.   Yes.
12         Q.   And the recommended of ForceField to
13    be applied to an ottoman is eight ounces; is
14    that correct?
15         A.   Where are we looking?
16         Q.   If you're -- I'm sorry.  Looking at
17    Table 2, --
18         A.   Oh, okay.
19              And you said 8 ounces for ottoman?
20         Q.   Yes -- yes, sir.
21         A.   That's correct.
22         Q.   So is the size of a sofa two times the
23    size of an ottoman?
24         A.   I don't know.
25         Q.   Is the size of the sofa two times the
```

1              THE WITNESS:  Thank you.

2              THE REPORTER:  You're welcome.

3    BY MR. LEE:

4        Q.   And I would like to draw your

5    attention specifically to the last full sentence

6    -- I'm sorry, to the application section on Page

7    1 of what we've marked as Exhibit 100, and this

8    is the ForceField leather protector from

9    htp.www.shieldindustries.com/F_LPR.htm.

10             And under applications it says,

11   use on all types of finish or painted leather

12   protectant from damages and premature that aging

13   that can be -- because from spills and soiling,

14   which is --

15       A.   Weird wording.

16       Q.   -- weird wording, but accurately

17   read.  Using a -- using a clean white cloth,

18   apply small amounts of the protector to the

19   leather surface with a rubbing motion and work

20   the protector into the hyde.  Can be sprayed on

21   the surface, as well.

22             Did I read that accurately?

23       A.   Yes.

24       Q.   In the application instructions,

25   is there a recommended amount for the leather

1    protectant?

2         A.   No.

3         Q.   So unlike the fabric protectant

4    Technical Data Sheet, it does not say to apply

5    16 ounces for a sofa, 12 ounces for a love seat

6    or eight ounces for a chair?

7         A.   Correct.

8         Q.   In your review of documents you did

9    as part of this assignment, did you review any

10   documents to support the assumption you were

11   asked to make that leather would require the

12   same amount of protection as fabric?

13        A.   No.

14             MR. MCNAMARA:   Objection to form.

15   BY MR. LEE:

16        Q.   Okay.  As part of your assignment, did

17   you do any analysis or other work to determine

18   whether or not the -- the pieces of furniture

19   in Category 2 would result in having the same

20   number of ounces per -- I'm sorry.  Strike that.

21   That's an unclear question.

22             Okay.  So did you do any analysis

23   to determine whether or not the furniture

24   categorized in Table 2 would result in pieces

25   having the same number of ounces per square

1   foot?

2        A.   I'm sorry.  Could you repeat that or

3   clarify it?  I lost you there.

4        Q.   Very fair.

5             So when we look at Table 2, there are

6   25 different categories of furniture, right?

7        A.   Correct.

8        Q.   And each one of those categories has a

9   number of ounces that is prescribed to it?

10       A.   Correct.

11       Q.   Did you do anything when making

12   these categorizations to determine that a chair

13   wouldn't receive the same numbers of ounces per

14   square foot as, say, a recliner?

15       A.   No.

16       Q.   And did you do any analysis to

17   determine that any one of these categories would

18   have consistent number of square foot per ounces

19   in the other category?

20       A.   No.

21       Q.   And in looking back at the TDS sheet

22   for chairs, it says the chairs should receive

23   eight ounces; is that correct?

24       A.   Are you on the fabric TDS now?

25       Q.   I'm on fabric.  Yes, sir.

1    opinion about that either way, but ...

2    BY MR. LEE:

3        Q.   So you have no opinion that a stool

4    which is much smaller than a recliner would not

5    take the same amount of protectant?

6        A.   I suppose it's --

7             MR. MCNAMARA:  Objection to form.

8             THE WITNESS:  I suppose it's possible

9    that some stools could have the same amount.

10            I would say, on average, stools could

11   be less than recliners.

12   BY MR. LEE:

13       Q.   Okay.  Do you agree that the

14   same -- like, a -- I'm sorry.  Strike that.

15            Do you agree that the same type of

16   material, be it a fabric or leather, should have

17   the same amount of protectant applied per square

18   foot regardless of the product?

19       A.   I don't have an opinion about that.

20       Q.   Okay.  So you have no opinion as

21   to whether or not, you know, if one ounce per

22   square foot was used for a chair, that same one

23   ounce per square foot should be used for, say, a

24   stool?

25       A.   I'm sorry.  Would you repeat that?

Page 58

1    do so?

2        A.    I don't have an opinion how you would

3    calculate how you would treat a --

4        Q.    The question is not how would you

5    treat it.  So looking at this bar stool, which

6    appears to have a square top, let's look at the

7    dimensions.  The dimensions of the stool are 15

8    by 15 by 25.5.  Is that accurate?

9        A.    Correct.

10        Q.    And I'll represent to you that

11    those are inches that we'll use for -- for the

12    purposes of this discussion.  And so if you were

13    looking at a bar stool that was 15 by 15, how

14    would you calculate the square footage of the

15    top portion of that stool?

16        A.    Just the square -- oh, so you would

17    take the 15 inches by the 15 and divide it by

18    12 to get square feet.

19        Q.    Okay.  And I will represent to you

20    that 15 divided by 12 is 1.25.  Does that sound

21    right to you?  I'm sure you're much better at

22    math than I am.

23        A.    Yeah.  That sounds about right.

24        Q.    So 1.25 times 1.25 is 1.56; is -- is

25    that right?

1      A.   Yes.

2      Q.   And so 1.56 would be the square

3   footage of the upholstered area of -- of that

4   stool.

5           MR. MCNAMARA:  Objection to form.

6   There's a cushion.  It's not a perfectly flat

7   piece of fabric that's on wood.

8           MR. LEE:  Oh, fair --

9           MR. MCNAMARA:  There's going to be

10  both.

11          MR. LEE:  Fair enough.  Yes.

12  BY MR. LEE:

13     Q.   But you could go ahead and answer.

14     A.    I believe that's roughly accurate.

15  I mean, it -- there's curvature down the side,

16  so there might be a little extra there.  But

17  roughly going by those dimensions, that's

18  accurate.

19     Q.   So if you were taking the square

20  footage of 1.56 and dividing it by eight ounces,

21  would that give you the square -- the ounces

22  per square foot to be treated on that piece of

23  furniture?

24     A.   Can we go through that again?

25     Q.   Sure.

1         So for a stool, you assumed each

2    stool would need eight ounces of fabric

3    protectant; is that correct?

4         A.   That's what I assumed, yes.

5         Q.   Right.  So if we look at a piece of

6    furniture, assuming that it's going to have

7    1.56 square feet of fabric to be treated, --

8         A.   Mm-hmm.

9         Q.   -- we divide that by eight ounces,

10   would that give you the ounces per feet

11   -- square feet?

12        A.   Yes.

13        Q.   So if you take a -- 1.56, which is

14   the square footage of this chair, divided by the

15   eight ounces, it would give you, approximately,

16   .2 ounces per square feet.  Does that sound

17   right?

18        A.   That doesn't sound right.

19        Q.   Or why don't we get out a piece of

20   paper.

21        A.   Okay.

22        Q.   So that I -- you won't have to rely

23   on my math, I will give you a paper and pen,

24   since I am sure that you are much better in math

25   than I am, --

```
 1            MR. MCNAMARA:  Do you want a
 2   calculator?
 3   BY MR. LEE:
 4       Q.   -- or whatever you prefer.  Do you
 5   have a calculator there?
 6       A.   My phone's off, but --
 7       Q.   Let me make sure I'm -- I think you're
 8   right.
 9            And I think I actually figured out why
10   I was causing confusion here.  Because instead
11   of giving you ounces over square feet, I was
12   giving you square feet over ounces.
13       A.   Okay.
14       Q.   So if you look at eight ounces divided
15   by 1.56 square feet, --
16       A.   Right.
17       Q.   -- that would give you about 1.95,
18   or .2 ounces per square feet.  Does that sound
19   right?  Or you have a cal -- why don't you go
20   ahead and --
21       A.   Well, my phone's off, so if someone
22   else has one I could -- my phone's off.
23            MR. LEE:  Why don't we take a pause
24   quickly --
25            MR. MCNAMARA:  Sure.
```

```
1              MR. LEE:  -- so we don't waste

2     video, --

3              MR. MCNAMARA:  Yeah.

4              MR. LEE:  -- and I will get that up.

5              THE VIDEOGRAPHER:  We are now off the

6     record at 11:13 p.m.

7              THE REPORTER:  A.m.

8              THE VIDEOGRAPHER:  A.m.

9              (Recess taken.)

10             THE VIDEOGRAPHER:  We are back on

11    record at 11:26 a.m.

12    BY MR. LEE:

13        Q.   Okay.  So, Mr. Jackman, before we took

14    a break, we were discussing Exhibit 101 and the

15    barstools that are depicted in that document.

16    And I think we had established that the square

17    footage of fabric on that barstool was

18    approximately 1.56 square feet; is that right?

19        A.   Yeah.

20        Q.   Five-six?

21        A.   Five-six.

22        Q.   And in table -- in the table

23    which sets out the number of ounces to apply of

24    ForceField protectant, you described bar stools

25    as needing eight ounces of protectant.  Is that
```

```
 1    accurate?
 2         A.    That's the required -- the recommended
 3    treatment amount, yes.
 4         Q.    And that was the recommended amount as
 5    provided by counsel; --
 6         A.    Correct.
 7         Q.    -- is that correct?
 8               And that is not a number you tested
 9    yourself; is that correct?
10         A.    Correct.
11         Q.    So if we were going to look at
12    the -- the square feet -- the -- the square feet
13    per ounce, we would take the 1.56 divided by
14    eight.  Is -- is that accurate?
15         A.    No.  It's the other way.
16         Q.    If we're doing square feet per ounce
17    or if we're doing ounces per square?  So we're
18    going to -- so if we're going to do square feet
19    per ounce, it would be the 1.56 divided by
20    eight.
21         A.    Square feet per ounce?  We would do
22    the -- let me think about this, because we've
23    gone back and forth a few times here.  If we
24    wanted to know the number of square feet treated
25    per ounce we would do -- right.  Yeah.
```

Page 64

1      Q.   Good.

2      A.   Making sure.

3      Q.   Sorry -- sorry for causing

4   confusion earlier, but, yeah, so we would

5   take the 1.56, divided by eight, and we would

6   get, approximately, .2, or .195, to be exact,

7   does that sound right?  And if you would like to

8   use a calculator, --

9      A.   Yeah.

10      Q.   -- we can do that.

11           And I'll let you type away.  So if you

12   want to take 1.56 --

13      A.   Yep.

14      Q.   -- divided by eight, --

15      A.   Eight ounces.  Yeah.  You get the

16   .195.

17      Q.   Okay.  It'll give you the .195.

18           MR. LEE:  Okay.  Next I'm going to

19   mark as Exhibit 102 an MIS sheet that has Bates

20   stamped RTG0001969.

21           (Deposition Exhibit No. 102, an MIS

22   sheet that has Bates stamped RTG 0001969, was

23   marked.)

24           THE WITNESS:  Thank you.

25           THE REPORTER:  You're welcome.

Page 66

1   you have my calculator back so we can make sure

2   we are all on the same page here with math.

3        A.   Okay.  Okay.  So would you like me to

4   calculate that square footage?

5        Q.   Yes, sir.  So let's calculate the

6   square footage of the top and the sides.

7        A.   So that is coming -- that's not --

8        Q.   That's probably inches.  You probably

9   need to --

10       A.   Yeah.

11            MR. MCNAMARA:  Isn't it also by

12   four?  Isn't it 42 by 42 by 15 by four?

13            THE WITNESS:  Yeah.

14            MR. LEE:  Yeah.

15            THE WITNESS:  Yeah.  So you've got

16   1,764 on the top in inches, and then let me just

17   divide that by 12, so we've got 147.

18   BY MR. LEE:

19       Q.   I will tell you how I did the math,

20   and you can tell me if it's right or not so that

21   -- this is not at all meant to be a trick.

22            So I took 42 divided by 12 times

23   42 divided by 12 and got 12.25, which would

24   represent the dimensions of the top of the

25   furniture -- the square footage of the top of

Page 67

1   the piece of furniture.  Does that sound right

2   to you?

3        A.   Right.  Yeah.  Yeah.  Yeah.

4        Q.   Okay.  And then in doing the sides,

5   I took 42 divided by 12 times 15 divided by 12,

6   and I multiplied that number by four to get 17.5

7   square feet.

8        A.   So you did the 42 divided by 12 --

9        Q.   By 12.

10       A.   -- and then 15 divided by 12?

11       Q.   Yes, sir.

12            So I took the 3.5 times the 1.25, and

13   then there are four sides so I multiplied it by

14   four, --

15       A.   Right.

16       Q.   -- and then you get 17.5 --

17       A.   Right.

18       Q.   -- square feet; is that right?

19       A.   Yes.

20       Q.   So then to get the total square feet

21   do we need to add the square footage with the

22   sides with the square foot at the top, so it

23   would be 12.25, plus the 17.5, and what do you

24   get there?

25       A.   I get the 29.75.

1      Q.   So the -- so you would agree that,

2   roughly, the tops and sides of this piece of

3   furniture are 29.75 -- 29.75 square feet?

4      A.   Yes.

5      Q.   Okay.  And for an ottoman, how many

6   ounces were you told by counsel that would need

7   to be provided for treatment?

8      A.   Eight.

9      Q.   So to get the square feet per ounce,

10  you would take the -- how would you arrive at

11  that calculation?

12     A.   You would divide that by eight.

13     Q.   And when you take -- take the 29.75

14  divided by eight, what number do you get?

15     A.   3.71.

16     Q.   Okay.  So looking at these

17  two examples, we have seen that the stool

18  required .195 square feet per ounce, and then

19  looking at the ottoman it required 3.72 square

20  feet per ounce.  Is that accurate?

21     A.   Yes.

22     Q.   Okay.  And in the -- and in this

23  example we're looking at, what is the variance

24  between the bar stool and the ottoman?

25          MR. MCNAMARA:  Objection to form.

```
 1            MR. LEE:  Percentage difference.
 2            THE WITNESS:  Oh.  Oh.  Oh.  Okay.
 3   BY MR. LEE:
 4       Q.   And maybe that was an unfair question,
 5   so thanks for clarifying that.  So, yeah, what
 6   is the percentage difference?
 7       A.   All right.  Why don't you --
 8       Q.   Oh, yeah.  Sorry.  It is extra locked
 9   as my children will take my phone and send
10   e-mails to clients.
11            So looking back at -- at the stool
12   and -- and the -- and the ottoman, what is the
13   percentage difference?
14       A.   So will you refresh me?
15       Q.   Okay.  So for the -- for the ottoman,
16   we had 3.72 square feet per ounce, and for the
17   stool we had .195 square feet per ounce.
18       A.   So I got the 19.
19       Q.   So about 19 percent difference?
20       A.   Yes.
21       Q.   Okay.  And -- and we've already
22   established that you did not do any testing to
23   make sure there was consistency between these
24   categorizations of products?
25       A.   Correct.
```

1          Q.    Okay.  And you also have already said

2     that you don't have any opinion as to whether or

3     not there should be consistency?

4          A.    Correct.

5          Q.    Okay.  And just so we're clear, there

6     is a 19 -- I said earlier there's a 19 percent

7     difference.  That would be -- I believe that was

8     a 19 times difference between the ottoman and

9     the barstool.

10         A.    Yeah.  That's right.

11         Q.    Okay.  Now, just another point of

12    clarification:  When you were doing the product

13    categorization, you said that Audrey Wright was

14    a person who did most of that categorization

15    work.  Is -- is that accurate?

16         A.    I wouldn't say most, but she did a

17    good amount of it, and spe -- specifically with

18    the coding of the -- the coding aspect of the

19    process.

20         Q.    And when doing that coding aspect,

21    what exactly was she doing?

22         A.    Well, it -- you know, it actually

23    takes a lot of lines of code to program that

24    process in SAS.  So she would start by looking

25    for keywords in -- in the product descriptions,

Page 75

1        A.    It was the date that they shipped the

2   product.

3        Q.    Now, looking, specifically, at Table

4   5, which then takes us onto Page 10, --

5        A.    Mm-hmm.

16       Q.    Doesn't that suggest, then, that there

17  was some inventory product being used?

18            MR. MCNAMARA:  Objection to form.

19            THE WITNESS:  I don't know.

20  BY MR. LEE:

21       Q.    And in Table 5, as a whole, did you

22  consider any inventory of ForceField that might

23  have been in stock?

24       A.    I did not.

25       Q.    If you had included a beginning