**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO.: 9:15-cv-81139-COHN/SELTZER

| | |
|---|---|
| Benjamin Hankinson, James Guerra, and Jeanette Gandolfo, Lisa Palmer, Donald Anderson, and Lisa Prihoda, individually and on behalf of others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> R.T.G. Furniture Corp., d/b/a Rooms to Go, RTG America, LLC, The Jeffrey Seaman 2009 Annuity Trust, RTG Furniture Corp. of Georgia, d/b/a Rooms to Go, RTG Furniture of Texas, L.P., d/b/a Rooms to Go, RTG Texas Holdings, Inc., and R.T.G. Furniture Corp. of Texas, <br><br> Defendants. | <u>**CLASS ACTION**</u> |

<u>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE**</u>
<u>**TESTIMONY OF CHRISTOPHER JACKMAN**</u>

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. i

BACKGROUND .............................................................................................................. 1

I.      LEGAL STANDARD.............................................................................................. 6

II.     ARGUMENT ........................................................................................................ 8

III.    JACKMAN IS QUALIFIED TO TESTIFY AS AN EXPERT ECONOMIST................ 8

IV.     JACKMAN'S OPINIONS ARE RELIABLE AND RELEVANT ................................... 8

        A.      Jackman's Reliance On Assumptions In The Formation Of His Opinions
                Goes Only To The Weight, Not The Admissibility, Of His Testimony. ............... 9
        B.      The Assumptions Underlying Jackman's Opinions Are Reasonable And
                Are Not Contrary To The Evidence. .................................................................. 10

V.      JACKMAN'S TESTIMONY WILL ASSIST THE JURY ............................................. 12

CONCLUSION................................................................................................................. 14

## TABLE OF AUTHORITIES

Page(s)

CASES

*Allison v. McGhan Med. Corp.*,
  184 F.3d 1300 (11th Cir. 1999) ...........................................................................7

*Am. Gen. Life Ins. Co. v. Schoenthal Family, LLC*,
  555 F.3d 1331 (11th Cir. 2009) ...........................................................................8

*Bonner v. ISP Technologies, Inc.*,
  259 F.3d 924 (8th Cir. 2001) .........................................................................7, 10

*Bowers v. N. Telecom, Inc.*,
  905 F. Supp. 1004 (N.D. Fla. 1995)......................................................................7

*Bray & Gillespie IX, LLC v. Hartford Fire Ins. Co.*,
  6:07-CV-326-ORL-DAB, 2009 WL 1046354 (M.D. Fla. Apr. 20, 2009) ............10

*Clena Invs., Inc. v. XL Specialty Ins. Co.*,
  280 F.R.D. 653 (S.D. Fla. 2012).........................................................................8

*Daubert v. Merrell Dow Pharm.*,
  509 U.S. 579 (1993)................................................................................. *passim*

*Daubert v. Merrell Dow Pharm., Inc.*,
  43 F.3d 1311 (9th Cir. 1995) .............................................................................14

*Dollar v. Long Mfg., N.C., Inc.*,
  561 F.2d 613 (5th Cir. 1977), *cert. denied*, 435 U.S. 996 (1978)..........................14

*Khoday v. Symantec Corp.*,
  93 F.Supp.3d 1067 (D. Minn. 2015)....................................................................12

*Kumho Tire Co.,Ltd. v. Carmichael*,
  526 U.S. 137 (1999)..................................................................................6, 7, 8

*Maiz v. Virani*,
  253 F.3d 641 (11th Cir.2001) .......................................................................10, 11

*Pleasant Valley Biofuels, LLC v. Sanchez-Medina*,
  13-23046-CIV, 2014 WL 2855062 (S.D. Fla. June 23, 2014)..........................9, 10

*Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*,
  326 F.3d 1333 (11th Cir. 2003) ......................................................................8, 9

*In re St. Jude Med., Inc. Silzone Heart Valves Products Liab. Litig.*,
   493 F. Supp. 2d 1082 (D. Minn. 2007) .................................................................................7

*U.S. v. Frazier*,
   387 F.3d 1244 (11th Cir. 2004) .............................................................................................6

*United Fire & Cas. Co. v. Whirlpool Corp.*,
   704 F.3d 1338 (11th Cir. 2013) .............................................................................................7

*United States v. Paul*,
   175 F.3d 906 (11th Cir. 1999) ...............................................................................................7

*Williams v. Illinois*,
   132 S. Ct. 2221 (2012) ............................................................................................................9

## OTHER AUTHORITIES

Federal Rule of Evidence 702 ........................................................................................ *passim*

Rule 403 ......................................................................................................................................14

Rule 703 ........................................................................................................................................7

## INTRODUCTION

Plaintiffs and prospective class members purchased an add-on service from furniture seller Rooms To Go ("RTG").[1] For about 10% of the price of its furniture, RTG promises customers that its furniture will be professionally treated prior to delivery with a product called ForceField that will repel common household food and beverage spills. RTG charges a premium for its ForceField Protection Plan ("Plans"), and sold over ███████ Plans during the Class Periods. Plaintiffs' economist, Christopher Jackman, collected and reviewed sales data regarding the Plans, the purchase data of the ForceField leather and fabric protectant, and the recommendations for application amounts provided by Shield Industries (the sellers of ForceField). Mr. Jackman analyzed this data and produced a series of tables showing 1) how much RTG made off the Plans; 2) how little protectant RTG applied on average to each of the pieces of furniture covered by a Plan, and 3) the fraction of the recommended coverage amounts RTG applied to the furniture during the Class Periods. ECF No. 113, Tab 22, Jackman Report. Mr. Jackman is qualified to relate his analysis, used reliable methodologies including excel and SAS computer programs, and his testimony coalescing dozens of data files will aid the trier of fact.

Defendants (collectively "RTG") seek to prevent Jackman from testifying to the jury under the specious claim that his testimony is unreliable and irrelevant. Defs.' Mot. to Exclude C. Jackman, ECF No. 128. But, as demonstrated below, Mr. Jackman's opinions are reliably based on RTG's own data and the recommendations of the ForceField manufacturer and are relevant to the issues in this case. RTG's arguments deriding those recommendations are not appropriate matters to decide on a motion to exclude: they present a classic issue of weight for the jury and not admissibility for the Court. RTG's motion to exclude should be denied.

## BACKGROUND

Chris Jackman took on the arduous task of aggregating the data in 18 Excel files containing RTG's ForceField Plan sales data of the different RTG entities in this case, assembling the ForceField purchasing data of those entities, and calculating the average amount

---

[1] Defendants include RTG entities that directly sell the ForceField plans to customers (R.T.G. Furniture Corp., RTG Furniture Corp. of Georgia, and RTG Furniture of Texas, L.P.), and those related entities that may receive the revenues from those sales (RTG America, LLC, The Jeffrey Seaman 2009 Annuity Trust, RTG Texas Holdings, Inc., and R.T.G. Furniture Corp. of Texas).

of protectant that could have been applied to each piece of RTG furniture during the class period. He further determined the amount that *could* have been applied was vastly less than the amount that *should* have been applied, and determined, on a yearly percentage basis, what amount of protectant recommended to treat its furniture sold under a protection plan was actually purchased by RTG.

In Table 6 of his declaration, Jackman sets out his opinion with regard to the amount of protectant that RTG *could* have possibly applied to each item of furniture it sold with a ForceField Protection Plan:



ECF No. 113, Tab 22, Jackman Decl. at 11. As explained by Jackman, this table shows "the amount of ForceField protectant purchased for a given state[,Florida, Georgia, and Texas,] material type[, fabric or leather,] and for relevant year, divided by the net quantity of furniture products sold within those same parameters." **Ex. A** (Jackman Dep.) at 88:9-13. Thus, for instance, in Florida, RTG purchased enough protectant in ███████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████ Jackman Decl. at 11. Jackman generously assumed that every ounce of ForceField purchased in a given year made it on to the furniture. Jackman Dep. at 87:2-88:3. Thus, any possible waste or evaporation was ignored. *Id*.

Jackman also determined that the amount of protectant that *could* have been applied by RTG is much less than the amount of protectant that *should* have been applied by RTG. To make this determination with regard to the fabric protectant, Jackman relied upon the Technical Data Sheet prepared by Shield Industries, the manufacturer of the protectant, which calls for 8 fluid

ounces to protect chairs, 12 fluid ounces to protect loveseats, and 16 fluid ounces to protect sofas. *Id.* at ¶ 9. For the leather protectant, the manufacturer failed to include recommended coverage amounts for furniture product categories, so Jackman used the same amounts recommended with regard to the fabric protectant in his calculations. *Id.* at ¶ 10; Ex. A at 24:14-23. In Table 2 of his declaration, Jackman summarizes the recommended amounts by the furniture category he used in his calculations:



Jackman Decl. at 6. Because the manufacturer's recommendations were limited to three category types, Jackman created the additional 22 category types listed in Table 2 based upon the direction of Plaintiffs' counsel. **Ex. A** at 42:13-21.

As the RTG sales data contains ████ unique product descriptions and ████ unique stock keeping units ("SKU"), Jackman assigned each transaction in the sales data to one of the product categories in Table 2. Jackman Decl. at ¶¶ 8-9. When making such assignments, Jackman made conservative assumptions, *id.* at 4, n. 4, and used his best judgment. **Ex. A** at 31:15-25. He excluded categories of furniture that had unclear product descriptions or ████████████ ████████████████████████████████████████████████████ ████████████████████ Jackman Decl. at 5, n. 5.

In order to calculate the amount of protectant recommended for RTG's sales of ForceField Protection Plans in Georgia, Florida, and Texas during the relevant time periods, Jackman used data from RTG that outlined by SKU the type of material (fabric or leather) each product was made of, eliminating any items for which material information was unavailable. Jackman Decl. at ¶¶ 11-12. Then, "for each furniture material type, furniture product category, year, and state, [he] multiplied the quantity of ForceField Protection Plans sold by the amount of ForceField protectant (in fluid ounces) recommended to treat each furniture product category for

each relevant year, furniture material, and state." *Id*. at ¶ 12. The results of Jackman's calculations are shown in Table 3 of his Declaration:



*Id*. at 8.

Then, to determine the amount of protectant purchased by RTG, Jackman reviewed data from the protectant manufacturer regarding RTG's annual purchases of fabric and leather protectant, which were sold in measured 55-gallon drums. Jackman Dec. at ¶ 13. When necessary to determine the amount sold during a partial year, Jackman calculated the percentage that the protection plans sold during the partial year accounted for the full years' sales and multiplied that percentage by the total number of fluid ounces of protectant purchased during the full year. *Id*. at ¶ 14. To determine the amount of protectant purchased by RTG for Florida, Georgia, and Texas during the relevant time period, Jackman converted RTG's purchases of 55-gallon drums of ForceField protectant into fluid ounces. *Id*. at ¶ 16. Because RTG furniture delivered to certain areas in the western Panhandle region of Florida were claimed by RTG to be treated in Louisiana, Jackman "conservatively included all of [RTG's] purchases of ForceField protectant in Louisiana" when making his calculations. *Id*. at 8, n.14. Jackman's opinions regarding the amount of ForceField Protectant purchased by RTG are contained in Table 5:



*Id.* at 10.

Jackman was then able to compare the amount of protectant purchased by RTG with the amount of protectant recommended by dividing the amount of purchased protectant from Table 5 by the amount of recommended protectant from Table 3. *Id.* at ¶ 18; <u>Ex. A</u> at 22:5-23:9; 24:7-10. The results are contained in Table 7, which contains Jackman's opinions regarding the "percentage of ForceField protectant Rooms To Go actually did purchase in a given state, year, and for a given material type, given the recommended amount it would have needed to purchase to treat the furniture it sold with a ForceField Protection Plan." Jackman Decl. at ¶18:



This table shows that "in a given year, Rooms To Go purchased ███████████████ ███████████████████████ of the leather ForceField protectant, that would have been recommended to treat its sales of fabric and leather furniture that were sold with a ForceField Protection Plan in Florida. Further, in a given year, Rooms To Go purchased between

████████████ of the fabric ForceField protectant, and ████████████ of the of the leather ForceField protectant, that would have been recommended to treat its sales of fabric and leather furniture that were sold with a ForceField Protection Plan in Georgia. Lastly, in a given year, Rooms To Go purchased between ████████████ of the fabric ForceField protectant, and ████████ of the of the leather ForceField protectant, that would have been recommended to treat its sales of fabric and leather furniture that were sold with a ForceField Protection Plan in Texas." *Id*. at ¶ 19.

## I.      LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony. The Rule allows a witness qualified as an expert by knowledge, skill, experience, training, or education to testify in the form of opinion or otherwise if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case, provided that the "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702.

The Eleventh Circuit set forth a three part inquiry to determine the admissibility of expert testimony under Rule 702. A court in this district must evaluate whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *U.S. v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004).

In *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993), the Supreme Court tasked trial courts performing a Rule 702 analysis with acting as a gatekeeper ensuring that an expert's testimony rests on "a reliable foundation and is relevant to the task at hand." 509 U.S. at 597. The primary reason for the gatekeeping function is to encourage trial courts to weed out "junk science" based on new and novel tests and innovative scientific techniques found in the "twilight zone" of credibility. *Kumho Tire Co.,Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). It is neither to measure every expert by an inflexible set of criteria, nor to challenge the ultimate result and final conclusion of every expert. The Court must undertake whatever inquiry is necessary to "make certain that an expert, whether basing testimony upon professional studies or personal

6

experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.*

A *Daubert* inquiry does not focus on whether the expert's opinion is correct; rather it focuses on whether the opinion is consistent with the methods of analysis of the expert's particular field. *Bowers v. N. Telecom*, *Inc.,* 905 F. Supp. 1004 (N.D. Fla. 1995). "[A]n expert's opinion should be excluded as unreliable only if that 'opinion is so fundamentally unsupported that it can offer no assistance to the jury.'" *In re St. Jude Med., Inc. Silzone Heart Valves Products Liab. Litig.*, 493 F. Supp. 2d 1082 (D. Minn. 2007) (quoting *Bonner v. ISP Technologies, Inc.*, 259 F.3d 924 (8th Cir. 2001)).

As the Eleventh Circuit has emphasized, the district court's gatekeeper role is not intended to "supplant the adversary system or the role of the jury: 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Allison v. McGhan Med. Corp.,* 184 F.3d 1300 (11th Cir. 1999) (quoting *Daubert*, 509 U.S. at 596).

In *Kumho*, the Supreme Court explained "that rules 702 and 703 give all expert witnesses testimonial leeway unavailable to other witnesses on the presumption that the expert's opinion 'will have a reliable basis in the knowledge and experience of his discipline.'" *United States v. Paul*, 175 F.3d 906, 910 (11th Cir. 1999) (quoting *Kumho*, 526 U.S. at 148). "Moreover, the Court held that a trial judge may consider one or more of the specific *Daubert* factors when doing so will help determine that expert's reliability." *Id.* (citing *Kumho*, 526 U.S. at 151). "But, as the Court stated in *Daubert*, the test of reliability is a 'flexible' one, and *Daubert*'s list of specific factors neither necessarily nor solely applies to all experts or in every case." *Id.* (quoting *Kumho*, 526 U.S. at 151). "Alternatively, *Kumho* declares that 'the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination.'" *Id.* at 910-11 (quoting *Kumho*, 526 U.S. at 139). Some of the factors the court has the flexibility to consider "when assessing the reliability of an expert's testimony [are]: (1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the theory or technique used by the expert has been subjected to peer review and publication; (3) whether there is a known or potential error rate of the methodology; and (4) whether the technique has been generally accepted in the relevant scientific community." *United Fire & Cas. Co. v. Whirlpool Corp.*, 704 F.3d 1338, 1341 (11th Cir. 2013) (citing *Daubert* at

593–94). But not all, or even any, of these factors need to be present in order for the court to find an expert's testimony is reliable.

## II.    ARGUMENT

Jackman satisfies all three prongs of Rule 702 and the *Daubert* inquiry. He is well-qualified, his opinions are reliable, and those opinions will be helpful to the jury. Defendants' challenges to Jackman's testimony go to the weight – not the admissibility – of his testimony. Defendants ask this Court to set the admissibility bar too high and to evaluate the persuasiveness of Jackman's proffered evidence. The Court should decline this invitation.

## III.    JACKMAN IS QUALIFIED TO TESTIFY AS AN EXPERT ECONOMIST

Under Rule 702, an expert can satisfy the qualification prong by his "knowledge, skill, experience, training or education." A witness may be qualified as an expert by virtue of any one of the five factors, or upon a combination of them. *See, e.g., Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1343 (11th Cir. 2003). Christopher Jackman, who has an undergraduate degree in economics from Johns Hopkins, an MBA from Indiana University, Ex. A (Jackman Dep.) at 9:25-10:3, and worked as a Managing Director at Nathan Associates, Inc., a business and economic consulting firm that provides economic research and analysis, Jackman Decl. at ¶1), is qualified to testify as an expert economist in this matter. RTG does not appear to challenge his qualifications.

## IV.    JACKMAN'S OPINIONS ARE RELIABLE AND RELEVANT

Jackman's opinions and testimony are reliable and relevant to the issues in this case. The reliability prong of Rule 702 is satisfied if the proposed expert testimony is "supported by appropriate validation – i.e., good grounds, based on what is known." *Clena Invs., Inc. v. XL Specialty Ins. Co.*, 280 F.R.D. 653, 662 (S.D. Fla. 2012).

As the court noted in *Kumho*, "the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending upon the nature of the issue, the expert's particular expertise and the subject of his testimony." 526 U.S. 137 (1999). In performing this inquiry, standards of scientific reliability, such as testability and peer review, do not apply to all forms of expert testimony. *Am. Gen. Life Ins. Co. v. Schoenthal Family, LLC*, 555 F.3d 1331, 1338 (11th Cir. 2009).

As recognized in the Advisory Committee Notes to the 2000 Amendment to Rule 702, which incorporated *Daubert* and governs *Daubert* motions such as the one at issue here: "Some types of expert testimony will be more objectively verifiable, and subject to the expectations of falsifiability, peer review, and publication, than others. Some types of expert testimony will not rely on anything like a scientific method, and so will have to be evaluated by reference to other standard principles attendant to the particular area of expertise."

Here, Jackman's opinions are based on factual information generally relied upon in the scientific community—mathematical calculations based on sales data and purchase data and reasonable assumptions based on manufacturer's recommendations—as well as his own extensive education and experience. Jackman utilized computer programs, such as SAS and excel, that have a known reliability. Jackman Dep. at 84:22-85:22. Because Jackman's opinions are based on sufficient facts and methodology, he should be permitted to testify as an expert in this case.

A.    **Jackman's Reliance On Assumptions In The Formation Of His Opinions Goes Only To The Weight, Not The Admissibility, Of His Testimony.**

RTG contends that the Court should exclude Jackman's opinions regarding the ratio of ForceField purchased to protectant recommended as unreliable because Jackman relied on certain assumptions to make the calculations underlying this opinion. ECF No. 128 at 7-10. Attacks on Jackman's assumptions may be appropriate on cross-examination to challenge the weight the jury should assign to Jackman's opinions, but they are not grounds for excluding his opinions from trial. Jackman's use of assumptions does not render his opinion unreliable. Indeed, it is common and permissible for experts to rely on assumptions to reach their opinions. *See Williams v. Illinois*, 132 S. Ct. 2221, 2234 (2012) ("Modern rules of evidence continue to permit experts to express opinions based on facts about which they lack personal knowledge. . . ."). And RTG's motion to exclude Jackman's opinions due to his use of assumptions misses the mark because "'[r]eliability" under *Daubert . . .* goes more to an expert's methodology than the correctness of underlying assumptions." *See Pleasant Valley Biofuels, LLC v. Sanchez-Medina*, 13-23046-CIV, 2014 WL 2855062, at *6 (S.D. Fla. June 23, 2014) (citing *Quiet Tech. DC–8 v. Hurel-Dubois UK Ltd.,* 326 F.3d 1333, 1345–46 (11th Cir. 2003)). Thus, RTG's argument that the assumed data underlying Jackman's opinions is faulty or untrustworthy does not speak to the opinions' reliability—it merely goes to the weight, not the admissibility, of Jackman's testimony

and creates an issue for cross-examination. *Id*. at *5-6; *see also Bray & Gillespie IX, LLC v. Hartford Fire Ins. Co.*, 6:07-CV-326-ORL-DAB, 2009 WL 1046354, at *5 (M.D. Fla. Apr. 20, 2009) (holding defendants' argument that expert's opinion was based on incorrect assumptions, when use of assumptions by experts is permitted under *Daubert*, was "not an attack on the methodology, but on the application of an established methodology to a disputed set of facts [making it] fodder for cross-examination or rebuttal, but . . . not an admissibility issue"); *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001) ("As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination."); *Maiz v. Virani*, 253 F.3d 641, 667 (11th Cir.2001) (permitting an accounting expert to opine on forensic accounting issues based on "reasonable assumptions regarding the requirements of the applicable contracts").

**B.    The Assumptions Underlying Jackman's Opinions Are Reasonable And Are Not Contrary To The Evidence.**

RTG attacks three of Jackman's assumptions, all three of which were reasonable. First, RTG attempts to discredit Shield Industries' recommended coverage amounts by noting that Richard Bilbro (Shield's president) testified that he never tested or verified Shield's directions. ECF No. 128 at 9. However, this testimony has credibility issues, which must be resolved by a jury. ██████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████ Furthermore, Dr. Meirowitz's testimony provides another reason to find the Shield Industries' coverage recommendations credible. Dr. Meirowitz (a textile chemist) Dr. Meirowitz (a textile chemist) reviewed Shield Industries' recommendations and found that they were not out of the ordinary for a stain resistant treatment. **Ex. B**, Excerpt of Meirowitz Dep. at 172:2-8.[2]

---

[2] RTG misconstrues Dr. Meirowitz's findings. Dr. Meirowitz provides the opinion that, in order to professionally treat furniture, a company must test that the suggest amount of stain-resistant treatment is correct. Meirowitz Dep. at 77:7-23. And, Dr. Meirowitz agrees that testing is needed, in part, because different fabrics need different amounts of treatment. Meirowitz Dep. at 77:7-23. But despite the differences among fabrics, Dr. Meirowitz has uniformly found that furniture treated with 10% of the recommended amount will not effectively resist water and soil. Meirowitz Report at 23 (¶ 50 (g)). Finally, Dr. Meirowitz tested small swatches of fabric, not a

Similarly, RTG attacks Mr. Jackman's decision to treat chairs, stools, ottomans, etc. within the same eight-ounce category because it supposedly creates an absurd result in which pieces of varying sizes are supposed to be treated with the same amount of protectant. ECF No. 131 at 10-12. RTG offers a few potential self-serving examples of differences in furniture size such as bar stool with only 1.56 square feet of fabric to be treated with the same 8 ounces as a cocktail ottoman with an estimated 29.75 square feet of fabric. *Id.* at 12. Just as there are barstools with little fabric, there are chairs with even more fabric than the cocktail ottoman introduced at Jackman's deposition. More importantly, RTG misses the point of Jackman's exercise. Jackman is creating the categorization in order calculate the ratio of the aggregate ForceField that RTG purchased to the aggregate amount that RTG should have applied. *Id.* at 12 (Table 7). He does not claim to be creating individual calculations for the amount of protectant applied to any individual plaintiff's furniture. RTG can try to explain to the jury that not all the differences effectively wash out in the averaging, but that is not a basis to exclude Jackman's testimony. Furthermore, the categorization has no impact on Table 6, which calculates the "amount of ForceField protectant purchased by Rooms to Go per Each Unit of Furniture Sold with a ForceField Protection Plan." Ex. A at 11 (Table 6). Thus, even if the court were to exclude all of assumptions regarding categorization, Jackman could still opine that that RTG only purchased enough protectant to average ▮▮▮▮▮ ounces per piece of furniture during the class period.

Second, RTG criticizes Jackman for relying on Plaintiffs counsel's categorization for the 22 categories of furniture where Shield Industries does not provide recommended coverage amounts. ECF No. 128 at 9. Experts are allowed to rely upon "reasonable assumptions" that they are "asked to make by counsel." *Maiz v. Virani*, 253 F.3d 641, 667 (11th Cir.2001). And, the categorization provided by Jackman is very reasonable. See Jackman Decl. at 6 (Table 2). Of the 22 categories, 15 contained a single piece of furniture, and 7 are composites of two of the other 15 categories and/or chairs, loveseats, or sofas. *Id.* Of the 16 categories with a single piece of furniture, Jackman assigned the lowest category (8 ounces) to 10 of the 15 categories. *Id.* Jackman only assigned 16 ounces to two categories that also had the word "sofa" in them. *Id.*

---

piece of furniture, with ForceField. Meirowitz Dep. at 64:6-22; 102:5-10. Thus, the fact that he did not utilize the manufacturer's recommendations to treat the small swatch does not, in any way, undermine the validity of Shield's recommendations.

Jackman assigned 12 ounces to sleepers, sofa beds, and sleeper loveseats, *id.*, because these types of furniture are generally between the size of chairs and sofas.

Third, RTG contends that Jackman should not have been able to rely on the assumption that fabric and leather furniture required the same amount of treatment. ECF No. 128 at 9-10. However, the record supports that this is a reasonable assumption. Innovative Chemical Technologies ("ICT") creates the ForceField protectants for fabric and leather and sells them to Shield Industries. ICT's technical data sheets recommend that both fabric and leather protectants are applied at the same coverage level, 1 fluid ounce per square yard. **Ex. C,** Hauser Ex. 11 (TDS for Flexipel 98 and Flexipel 99).[3]

## V.    JACKMAN'S TESTIMONY WILL ASSIST THE JURY

Jackman's testimony will aid the jury. The RTG sales data for the three states at issue spans eighteen spreadsheets. Jackman Decl. at 3 n. 2. The total number of transactions at issue ▮▮▮▮▮▮▮▮▮▮. The ForceField purchase data from Shield Industries is spread over several documents, and the Class Periods do not start and stop on the first date of any year. No jury should have to engage in cobbling these numbers together, when Mr. Jackman has, through the use of SAS, done it for them at considerable effort by writing code to load the data from the Excel files into the data processing software **Ex. A** at 84:24-85:22. Even if the mathematics used is rather rudimentary, the work Jackman has done assists the jury and should be admitted. *Khoday v. Symantec Corp.,* 93 F.Supp.3d 1067, 1086-87 (D. Minn. 2015) (denying *Daubert* motion for economist who "did not merely perform basic math from readily-accessible numbers, but rather he aggregated sales data from across multiple sources" and noting that even where an expert is merely using basic math, it may aid the jury).

RTG argues that Jackman's opinions will not aid the jury as they do not "fit" Plaintiffs' case. ECF No. 128 at 12-13. RTG claims that "plaintiffs need to prove how their furniture was actually treated." *Id.* But that does not mean that Plaintiffs need to prove the exact protectant

---

[3] RTG again misconstrues Dr. Meirowitz's findings. Contrary to RTG's assertion, Dr. Meirowitz did not testify that he could not offer any opinions on leather because the products were different. Rather, Dr. Meirowitz testified that he could not offer an opinion as to whether "there was a different fabric treatment a different leather treatment. Meirowitz Dep. at 80:7-20. And, contrary to RTG's assertion, Dr. Meirowitz did not testify that applying a fluorochemical to fabric and leather would necessarily be different at all; he merely admitted that they "might be different." Meirowitz Dep. at 37:3-22. This does nothing to undermine ICT's technical data sheets' explicit recommendation that fabric and leather receive the same amount of ForceField.

amounts that reached the furniture. Plaintiffs' theory is that RTG's lack of any standards in the application process precluded the class that purchased the add-on fabric protection plans from having their furniture "professionally treated". Jackman's testimony fits that theory. First, Plaintiffs can show RTG did not come close to the coverage recommendations of Shield – who provided instructions to customers like RTG which they wholly ignored. Jackman Decl. at 12, Table 7. Second, even if Shields recommendations are shown to be meritless, the ad hoc application process that RTG used led to an average of ██████████ fluid ounces reaching the furniture during the class period. Jackman Decl. at 11, Table 6. ICT's technical data sheets recommend that both fabric and leather protectants are applied at the same coverage level, 1 fluid ounce per square yard. **Ex. C,** Hauser Ex. 11 (TDS for Flexipel 98 and Flexipel 99). Even the barstool at 1.56 square feet of fabric surface (or .52 square yards) would require a half an ounce for coverage. The cocktail ottoman would require 9.9 fluid ounces,[4] which is ██████████████ than the average amount of protectant applied in any state for either fabric or leather during the class period.[5] When combined with other expert testimony, the jury can consider whether such a paltry protectant output from the RTG process would not constitute "professional treatment" under the contract and RTG's representations. Because Jackman's testimony is relevant to this theory, it should not be excluded. This is not a "trial by formula," ECF No. 128 at 13, as Plaintiffs are not using any of the tables created by Jackman to determine individual damages.

RTG also argues that Jackman cannot give his opinion based merely on the data showing RTG's purchases of protectant during the class periods, without knowledge regarding the stock of protectant RTG already had on hand, and knowledge regarding the actual amounts of protectant applied by RTG to each item of furniture. *Id*. at 13. First, RTG ignores the assumptions Jackman made to their benefit. He generously assumed that every fluid ounce of a 55-gallon drum of ForceField purchased in a given year made its way onto the furniture. This would include protectant purchases made late in a year, and regardless of any waste, slack, or evaporation. Jackman Dep. at 86:3-88:3. But if RTG does want to attack Jackman for not knowing how much of a protectant it had on hand at the beginning of each class period, it can raise that with the jury to have them consider the appropriate weight that jurors should give

---

[4] (29.75 sq. ft.) / (3 feet per yard) = 9.9 sq. yards. And, (9.9 sq. yards) x (1 ounce per yard) = 9.9 fluid ounces.

[5] (9.9 fluid ounces) / (1.34 fluid ounces) = 7.4 ounces.

Jackman's opinion. This is not a grounds for excluding Jackman's opinions, as experts are permitted to base their opinions on reasonable assumptions. *See, supra*, discussion at Sec. IV.B.1.

Finally, RTG argues that permitting Jackman's testimony on the average amount of protectant applied to each piece "would be unduly prejudicial" because the jury might think the average amount applied was the actual amount applied to each piece of furniture. ECF No. 128 at 13. This assumes a jury incapable of understanding the elementary concept of what constitutes an average. RTG can try to explain that in some instances its employees may have applied more protectant, while at other times their employees may have skipped a piece, meaning one customer may have got "far below the average (zero) and the other could be well above the average". *Id*. But that argument probably will not aid RTG in defending against Plaintiffs' claims that it failed to use professional standards when executing the fabric protection portion of the Plans. The truth may hurt, but it is not unduly prejudicial. *See Dollar v. Long Mfg., N.C., Inc.*, 561 F.2d 613, 618 (5th Cir. 1977), *cert. denied*, 435 U.S. 996 (1978) ("Of course, 'unfair prejudice' as used in Rule 403 is not to be equated with testimony simply adverse to the opposing party. Virtually all evidence is prejudicial or it isn't material. The prejudice must be 'unfair.'").

## CONCLUSION

For the aforementioned reasons, the Court should deny Defendants' motion to exclude the testimony of Chris Jackman.[6]

---

[6] In the event the Court is inclined to grant Defendants' motion to exclude the opinion testimony of Christopher Jackman, Plaintiffs respectfully request that the Court hold a *Daubert* hearing to "consider the conflicting evidence and make findings about the soundness and reliability of the methodology employed by the scientific experts." *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1319 n.10 (9th Cir. 1995).

DATED: January 5, 2017            _____/s/ Theodore J. Leopold_____

Theodore J. Leopold (FL Bar No. 705608)
Leslie M. Kroeger (FL Bar No. 989762)
Diana L. Martin (FL Bar No. 624489)
COHEN MILSTEIN SELLERS & TOLL PLLC
2925 PGA Boulevard, Suite 200
Palm Beach Gardens, FL  33410
Telephone:  (561) 515-1400
Facsimile:  (561) 515-1401
tleopold@cohenmilstein.com
lkroeger@cohenmilstein.com
dmartin@cohenmilstein.com

Douglas J. McNamara (pro hac vice)
Eric A. Kafka (pro hac vice)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue, NW
East Tower, 5th Floor
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
dmcnamara@cohenmilstein.com
ekafka@cohenmilstein.com

*Counsel for Plaintiffs*

15

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 5, 2017, a true and correct copy of the foregoing was served by transmission of Notice of Electronic Filing generated by CM/ECF on all counsel or parties of record on the Service List below.

/s/ Theodore J. Leopold
Theodore J. Leopold

## <u>SERVICE SERVICE LIST</u>

Jamie Zysk Isani
**HUNTON & WILLIAMS LLP**
1111 Brickell Avenue, Suite 2500
Miami, Florida 33131
Telephone: (305) 810-2500
Facsimile: (305) 810-1675
jisani@hunton.com

Walfrido J. Martinez
**HUNTON & WILLIAMS LLP**
200 Park Avenue
New York, New York 10166
Telephone: (212) 309-1316
Facsimile: (212) 309-1100
wmartinez@hunton.com

Randi Engel Schnell
Frank M. Lowrey IV
Joshua F. Thorpe
**BONDURANT MIXSON & ELMORE LLP**
One Atlantic Center
1201 West Peachtree Street NW, Suite 3900
Atlanta, GA 30309
Telephone: (404) 881-4100
Facsimile: (404) 881-4111
schnell@bmelaw.com
flowery@bmelaw.com
thorpe@bmelaw.com

*Counsel for Defendants*