IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 9:15-CV-81139-COHN/SELTZER

BENJAMIN HANKINSON, JAMES
GUERRA, JEANETTE GANDOLFO, LISA
PALMER, DONALD ANDERSON, and LISA
PRIHODA, individually and on behalf of
others similarly situated,

       Plaintiffs,

v.

R.T.G. FURNITURE CORP., d/b/a Rooms
To Go, RTG AMERICA, LLC, THE
JEFFREY SEAMAN 2009 ANNUITY
TRUST, RTG FURNITURE CORP. OF
GEORGIA, d/b/a Rooms To Go, ROOMS
TO GO NORTH CAROLINA CORP., d/b/a
Rooms To Go, RTG FURNITURE OF
TEXAS, L.P., d/b/a Rooms To Go, RTG
TEXAS HOLDINGS, INC., and R.T.G.
FURNITURE CORP. OF TEXAS,

       Defendants.

**PLAINTIFFS' UNOPPOSED MOTION TO CONDITIONALLY CERTIFY
CLASS, PRELIMINARILY APPROVE SETTLEMENT, APPROVE CLASS NOTICE,
<u>AND SET FINAL FAIRNESS HEARING</u>**

      COME NOW the Plaintiffs, by and through counsel, and state as follows:

      1.      On August 12, 2015, Plaintiffs commenced this action. Subsequent amended

complaints and additional parties followed.

      2.      On May 8, 2017, with the assistance of a mediator, the parties reached an

agreement on terms to settle all claims that were or could have been asserted in this litigation, as

fully specified in the parties' Settlement Agreement (Exhibit 1).

      3.      On May 9, 2017, with the assistance of a mediator, the parties reached an

agreement on fees and costs for Plaintiffs' Counsel.

4.      Plaintiffs hereby move unopposed to seek certification of the following settlement class:

> All Persons who purchased one or more ForceField Fabric or Leather Protection Plans from RTG (including all affiliates) in stores or online in the United States during the Class Period, excluding any ForceField Fabric or Leather Protection Plans that sold for $8.00 or less.

5.      Plaintiffs also move unopposed for preliminary approval of the settlement and the proposed notice.  (Although Defendants consent to all relief sought in this motion, they do not agree with—and in fact deny—the allegations set forth in the complaint and summarized in this motion.)

6.      A copy of the Settlement Agreement (Exhibit 1) which includes the proposed Preliminary Approval order, final approval order, voucher, website notice, class notice, and claim form and press release is attached hereto. Also attached are declarations of Plaintiffs' Counsel, Douglas McNamara (Exhibit 2), mediator Rodney Max (Exhibit 3), and Proposed Settlement Administrator Jonathan Carameros from KCC LCC (Exhibit 4).

WHEREFORE, Plaintiffs respectfully request that the Court grant this Motion and enter an Order Preliminarily Approving Settlement in the form attached as Exhibit 1(A). The Preliminary Approval Order requests that the Court: (i) conditionally certify the class for settlement and appoint Cohen Milstein as Class Counsel, and KCC LLC as Settlement Administrator; (ii) preliminarily approve the proposed settlement (the "Settlement"); (iii) approve the form and manner of distribution of notice, and the manner class members may opt out, submit a claim, or object to the settlement and (iv) schedule a final fairness hearing to determine whether the proposed Settlement should be finally approved and whether the request for attorneys' fees and expenses should be approved.

**INCORPORATED MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO
CONDITIONALLY CERTIFY CLASS, PRELIMINARILY APPROVE SETTLEMENT,
APPROVE CLASS NOTICE, AND SET FINAL FAIRNESS HEARING**

## I.   INTRODUCTION

Plaintiffs alleged that Rooms To Go ("RTG") stores charged customers for optional add-on purchases called ForceField Protection Plans ("Plans"), which were not fully delivered.  The Plans included the application of a stain repellant, called ForceField, to the customers' furniture, with a three-year limited warranty for household food and beverage stains.[1] The Plans cost between $10 and $89.99, depending on the type of the furniture and other factors. The Plaintiffs' theory of the case changed as discovery demonstrated that RTG personnel did not forgo applying ForceField protectants to every piece of furniture covered by a Plan; instead, Plaintiffs contend, customers received a low average amount of protectant, and RTG personnel may not have applied the protectants to all surfaces of customers' furniture. Plaintiffs' experts attempted to calculate a class-wide refund amount from the purchase price of the Plans for this alleged suboptimal application process. Those experts arrived at a diminution of value somewhere between 9.5% to 17.5%--correlating to about $5-$9 off the price of the average Fabric Protection Plan.

After two revised complaints, 24 depositions of fact witnesses, eight depositions of experts, six *Daubert* motions, a fully-briefed and argued motion for class certification, and repeated sessions with a mediator, the parties reached a compromise. In the attached Settlement Agreement, RTG agrees to partially refund purchasers of the Plans at 10% of the total amount that the customer paid for all Plans during the relevant period, or the customer may opt for a

---

[1] Although Defendants consent to all relief sought in this motion, they do not agree with—and in fact deny—the allegations set forth in the complaint and summarized in this motion.

3

voucher worth 45% of the total amount that the customer paid for all Plans during the relevant period.  RTG also will retrain personnel to help ensure proper application of the protectants. As such, purchasers who make a claim can obtain relief, without having the litigation risks if the case proceeded to decision on class certification and thereafter.

The Court should certify the class and approve the proposed settlement. First, this settlement is nationwide in scope.  In addition to resolving this action, it also moots a filed case in North Carolina and obviates the need for any further litigation. The settlement, reached through arms-length negotiation, is fair and reasonable, providing customers with benefits consistent with amounts that Plaintiffs' own experts calculated. The Settlement Notice suffices Due Process and Rule 23, as it will be emailed or mailed directly to customers, and spells out in simple English their rights and applicable deadlines. The requested fees and expenses are reasonable, consistent with other settlements approved by this Court. The Court should certify the proposed settlement class, preliminarily approve the proposed settlement, and set a date for a final approval hearing.

## II.     BACKGROUND

### A.     Plaintiffs' Complaints

Plaintiffs commenced this action on August 12, 2015, naming RTG Furniture Corp. as a Defendant. ECF No. 1; McNamara Decl. at ¶2. Plaintiffs originally alleged RTG stores failed to apply the fabric protectants at all. *Id.*  The operative Second Amended Complaint–drafted after some discovery was taken—alleged that either the protectants were not applied or were applied so haphazardly that it was unlikely any application was effective to resist stains. McNamara Decl. at ¶4. Plaintiffs also alleged that RTG salespersons would sometimes "slam" customers by adding the Plans to their bills without their consent. *Id.*

4

RTG moved to dismiss the Second Amended Complaint on June 27, 2016. ECF No. 90. The Court declined to dismiss all claims on September 29, 2016, but did dismiss the claims for punitive damages. ECF No. 120.

**B.     Discovery**

Discovery proceeded from January 2016 to December 2016. McNamara Decl. at ¶7. The parties conducted 24 fact depositions that included RTG personnel and former personnel, and the CEO of Shield Industries, who sells the ForceField product to RTG. *Id.* Plaintiffs also reviewed documents from the RTG Defendants, Shield, and ICT, a manufacturer of the protectants that are sold as ForceField. *Id.* Discovery showed that ForceField Plan purchases at RTG are electronically recorded. *Id.* at ¶8. That information allows RTG to readily determine when a Plan was purchased, how many Plans were purchased, how much was paid, and in what state. *Id.* Under RTG's practice, the purchase information includes a physical address, which is updated in RTG's system if a customer moves and contacts RTG, e.g., to receive service. *Id*

Plaintiffs also assembled six experts in the case. These experts included:

a) A scientist who tested Plaintiffs' furniture for evidence of ForceField protectant application;

b) A scientist and member of the American Association of Textile Chemists and Colorists who tested the efficacy of ForceField, and opined on the adequacy of RTG's protocol in applying the protectant to different fabrics;

c) A furniture expert who conducted a site visit to RTG's Lakeland, Florida site to review the ForceField application process;

d) An economist to examine RTG's records of purchases of ForceField products, and the sales of ForceField Plans, to calculate the average amounts of protectants applied

to furniture;

e) A marketing expert to create a conjoint analysis survey to determine the

discounted value of the Plans where the ForceField was not applied consistent with

Shield's recommendations (i.e., in small amounts, not to all surfaces); and

f) An economist and damages expert to apply all the different evidence to RTG's

sales data and opine on a class-wide damage amount.

McNamara Decl. at ¶9. RTG put up two experts of their own to rebut the Plaintiffs' experts. *Id.*

All eight experts were deposed by the completion of class briefing. *Id.*

Class briefing started in September of 2016 and was completed in February of 2017. *Id.*

at ¶10. In addition to class briefing (which included a sur-reply), RTG moved to exclude or limit

the testimony of all six of Plaintiffs' experts. *Id.* at ¶11. Oral argument on class certification was

held on April 18, 2017. *Id.* at ¶12

### C.    Settlement Negotiations

Plaintiffs and Defendants first attempted a mediation in Miami on February 9, 2017.

McNamara Decl. at ¶13. Aided by mediator, Rodney Max, the parties discussed the potential

contours of a settlement, but could not reach agreement. *Id. See also* Ex. 3, Decl. of Rodney S.

Max ("Max Decl.") at ¶12. The parties met again in Atlanta on February 17, 2017. McNamara

Decl. at ¶13; Max Decl. at ¶12. Further progress on an agreement was made, but the parties were

still far apart. *Id.*

After the April 18 class certification hearing, the parties rekindled mediation, discussing

via phone and email further settlement terms. McNamara Decl. at ¶14. On May 8, 2017, the

parties agreed to all material terms of settlement other than attorney's fees and expenses. *Id.* at

¶15. Only thereafter, the parties then discussed attorneys' fees and expenses. McNamara Decl. at

¶16; Max Decl. at ¶12. After exchanging several proposals via email and a teleconference, the parties reached agreement on the total amount Plaintiffs could seek in fees and costs on May 9, 2017. *Id.*

### D.    Material Terms of the Proposed Settlement (the "Agreement")

#### 1.    *Definition*

As noted in Exhibit 1, the proposed Settlement Class includes "All persons who purchased one or more ForceField Fabric or Leather Protection Plans from RTG (including all affiliates) in stores or online in the United States during the Class Period (defined [in the , Agreement]) excluding any ForceField Fabric or Leather Protection Plans that sold for $8.00 or less."[2] Agreement at I(A)(23). Because the claims are premised on state consumer protection or contract laws, the beginning time period for the "Class Period" was identified for each state. McNamara Decl. at ¶18; Agreement at I(A)(8).

#### 2.    *Benefits to the Class*

Under the Agreement, each class member can opt to receive either cash–10% of the total amount the claimant paid for all of the ForceField Plans—or a merchandise voucher for 45% of the total amount the claimant paid for all of the Plans, with a cap on the voucher of $125 per claimant. Agreement at 11-12. The cash amounts are capped at $13.5 million; if oversubscribed, the amount available to claimants decreases pro rata. *Id.* at 11. There is no limit to the total dollar value or number of the vouchers, which may be combined with other offers or discounts at Rooms To Go stores, with no minimum purchase requirement. *Id.* at 12 & Ex. C. The vouchers would be non-transferrable and expire four years after the settlement is finalized. *Id.* The median

---

[2] Plans that sold for less than $8.00 (and sometimes as little as a penny) are overwhelmingly likely to have been purchased by RTG employees and under circumstances not common and typical to persons purchasing at higher prices. McNamara Decl. at ¶19.

price of the Plans for most of the pertinent years was $49.99. McNamara Decl. at ¶8.

The Agreement also has non-monetary remedies. First, RTG will include an acknowledgment for customers to sign at the point of purchase confirming that they intend to purchase all of the items listed on the sales order, which would include, where applicable, ForceField Protection Plans. Agreement at 12. Second, RTG will undertake a retraining of its quality associates who are responsible for application of the fabric protectants, to help ensure that the protectants are applied to all upholstered, exposed surfaces (not including the bottom of the furniture or the dust cover) of any furniture for which a customer has purchased a ForceField Protection Plan. *Id*. at 13. The Agreement releases claims brought or which could have been brought in this lawsuit or in North Carolina Triplett lawsuit,[3] including any and all claims related to the marketing, advertising, purchase, offer to sell, or sale of the Plans or the application of any fabric or leather protectant or goods, services, or warranties related to those Plans, as more fully specified in the parties' Agreement. Agreement at 9-10. In addition, RTG agrees to pay all costs associated with preparing and disseminating the Class Notice. Agreement at 14.

       *3.    Notice*

The Agreement sets out both the distribution method and the format of class notice. Agreement at 13-14. The notice would be emailed to those for whom RTG has email addresses or, where there is no valid email address or an attempted email bounces back, mailed on a postcard directly to the addresses included in their sales invoice, as updated through the national change of address database. *See* Ex. 4, Decl. of J. Carameros of KCC, at ¶¶8-10. According to RTG, it receives email addresses both from store sales and on-line sales. For store sales, the email is entered if the customer provides it, including if the customer would like an emailed sales

---

[3] *Triplett v. Rooms To Go North Carolina Corp., d/b/a/ Rooms To Go, et al.*, Case No. 5:16-cv-926-FL (E.D.N.C.).

receipt. For on-line sales, an email is required. RTG may also receive email addresses when customers call RTG's customer service line or when a customer wants to be on RTG's email mailing list for information about sales and offers.

Under the Agreement if email notice is confirmed as undeliverable, a postcard notice will be directly mailed to the last known address of the customer. Agreement at 13. If the postcards are returned as undeliverable, the Settlement Administrator will re-mail to any forwarding address specified with the return or perform an address search and make a second attempt. *Id*. at 13; Carameros Decl. at ¶11. A case-specific website will also be created where the notice and other court related filings will be posted. Agreement at 14; Carameros Decl. at ¶13. The Settlement Website will contain the long form notice and a claim form that can be submitted electronically or downloaded for mailing. *Id.* Class Counsel will also post a notice on its website regarding the settlement. Agreement at 14 (¶ IV.A.5). KCC will also establish a toll-free phone number for Class Members seeking more information or to request a copy of the notice or claim forms. Carameros Decl. at ¶14.

The notice will provide: a) a unique claim number for each potential claimant that will permit that claimant to learn from the settlement website how much he or she would receive in the settlement; b) the options the claimant may have; c) how the claimant may make a claim (either at the settlement website or to contact the claims administration to obtain a claim form); d) how to object or opt out of the settlement; and e) the deadlines to file a claim, opt out, or object. *See, e.g.,* Agreement, Ex. D. The notice, in an understandable Q &A format, explains the claims, identifies class counsel, and provides the options for claimants, along with the deadlines to take action. *Id.* at Ex. E. The short claim form requires the claimant to 1) include the identifying number on the postcard or email and contact information; 2) select the cash or

voucher option; and 3) affix a signature (for mail submission) or submit online. *Id*. at Ex. F.

>        4.       *Timing*

The Agreement sets out a timeline for receipt of claims, opt outs, and objections, and

details their requirements. Agreement at 14-20. The dates are contingent on if and when the

Court enters the Preliminary Approval order. The Agreement provides:

- Class notice to be emailed or mailed to the class no later than 45 days after entry of the Preliminary Approval order ("Notice Date");

- Claimants have up to 30 days after the final approval hearing date to submit claims, if the settlement is approved;

- Class members seeking to object or opt out of the settlement have 60 days after the Notice Date. Agreement at ¶I(A)(13)(14)(15);

>        5.       *Attorneys' Fees and Service Awards*

The Agreement states Plaintiffs' counsel can seek up to $4 million for fees and expenses,

to be paid separately from the settlement compensation to the class. *Id*. at 20. The current class

representatives in the *Hankinson* case may apply for incentive awards of $3,500 each. *Id.* [4]

## III.    LEGAL STANDARD FOR CONDITIONAL CERTIFICATION AND PRELIMINARY APPROVAL

### A.    Standards for Conditional Certification of a Settlement Class

"A class may be certified 'solely for purposes of settlement where a settlement is reached

---

[4] If the Settlement is terminated for any reason, or the Court does not enter without material change the Final Approval Order and Judgment substantially in the form attached as Exhibit B to the Agreement, or the final approval is not affirmed on appeal or review without material change, the parties and the Action shall be restored to the status they occupied as of the date of this Motion. Agreement § VII.C. In addition, RTG has the right to terminate the Settlement if the number of Settlement Class Members who timely request exclusion from the Settlement Class equals or exceeds the percentage specified in a separate letter executed concurrently with the Settlement Agreement by Class Counsel and RTG. The percentage will be confidential except to the Court, who upon request will be provided a copy of the letter for in camera review. Agreement § VII.D.

before a litigated determination of the class certification issue.'" *Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1314 (S.D. Fla. 2005) (*quoting Woodward v. NOR–AMChem. Co.*, 1996 WL 1063670 *14 (S. D. Ala. 1996)); *see also Borcea v. Carnival Corp.*, 238 F.R.D. 664, 671 (S. D. Fla. 2006). Whether a class is certified for settlement or for trial, the Court must find that the prerequisites for class certification under Rule 23(a) and (b) of the Federal Rules of Civil Procedure are met. *Amchem Prods. v. Windsor*, 521 U.S. 591, 620 (1997). Cases involving relatively small individual damages inflicted on large numbers of people present classic examples of appropriate circumstances for class certification. *See, e.g., Parker v. Risk Mgmt. Alts., Inc.*, 206 F.R.D. 211, 213 (N.D. Ill. 2002). Settlements of small value cases can provide deterrence even if the payouts to purchasers are small. *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1355 n.24 (S.D. Fla. 2011). Thus "[d]oubts regarding the propriety of class certification should be resolved in favor of certification." *Singer v. AT&T Corp.*, 185 F.R.D. 681, 685 (S.D. Fla. 1998). In addition, because a Rule 23(b)(3) "opt out" settlement class is requested, at least one of the requirements of Rule 23(b) must be satisfied, although for a settlement class, the Court need not determine "whether the case, if tried, would present intractable management problems…for the proposal is that there be no trial." *Amchem*, 521 U.S. at 620.

**B.     Standards for Preliminary Approval**

Judicial review of a proposed class action settlement is a two-step process: preliminary approval and a subsequent fairness hearing. *Holman v. Student Loan Xpress, Inc.*, No. 8:08–cv–305–T–23-MAP, 2009 WL 4015573, at *4 (M.D. Fla. Nov. 19, 2009); *see also* MANUAL FOR COMPLEX LITIGATION § 21.632 (4th ed. 2006). In the first step of the process, a court makes a preliminary evaluation of the fairness of the settlement. *Jones v. Commerce Bancorp, Inc.*, No.

05-5600 RBK, 2007 WL 2085357, at *2 (D.N.J. July 16, 2007). The factors considered are (1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved. *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984). The court should be guided by the "strong judicial policy favoring settlement as well as by the realization that compromise is the essence of settlement." *Id*. The trial court should not make a proponent of a proposed settlement "justify each term of settlement against a hypothetical or speculative measure of what concessions might [be] gained." *Ass'n For Disabled Ams., Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 468 (S.D. Fla. 2002) (internal citations omitted). "'[A]ccordingly class-action settlements will be disapproved only upon 'considerable circumspection.'" *Mashburn v. Nat'l Healthcare, Inc.*, 684 F. Supp. 660, 667 (M.D. Ala. 1988) (quoting *Jamison v. Butcher & Sherrerd,* 68 F.R.D. 479, 481 (E.D. Pa. 1975)).

If the Court finds a settlement proposal "within the range of possible approval," it then proceeds to a fairness hearing. Having received notice of the settlement, all interested parties have an opportunity to be heard. The goal of the fairness hearing is "to adduce all information necessary to enable the judge intelligently to rule on whether the proposed settlement is 'fair, reasonable, and adequate." *Armstrong v. Bd. of Sch. Dirs.*, 616 F. 2d 305, 314 (7th Cir. 1980) (footnote omitted). At the fairness hearing, and based all information available to the court, the court decides whether to finally approve the proposed settlement. *See Fresco v. Auto. Directions, Inc.,* No. 03-CIV-61063-MARTINEZ- SIMONTON, 2009 U.S. Dist. LEXIS 125233, at *8 (S.D. Fla. Jan. 16, 2009).

## IV.     ARGUMENT

### A.     The Class Should be Conditionally Certified

#### 1.     The Settlement Class is Ascertainable and Rule 23(a) is Met

Rule 23(a)(1) requires that there be a sufficient number of class members to make joinder impracticable. "Under Rule 23(a)(1), the numerosity requirement is met if joinder of all members is impracticable. This requirement does not demand that joinder would be impossible, but rather that joinder would be extremely difficult or inconvenient." *Walco Invs., Inc. v. Thenen*, 168 F.R.D. 315, 324 (S.D.Fla.1996).  Generally, less than twenty-one is inadequate, and more than forty adequate. *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir.), *cert. denied*, 479 U.S. 883 (1986). As noted in Plaintiffs' motion for class certification, there is no dispute that the class is ascertainable. RTG has electronic records showing each purchase of the ForceField Plans. *See* Pls.' Mem. ISO Class Cert., (ECF No. 114) at 12. Given the quantity of Fabric Protection Plans sold by RTG during the various Class Periods, numerosity is easily met. ECF No. 114 at 12.

Commonality is also established. To satisfy the commonality requirement of Rule 23(a)(2), there must be at least one question of law or fact common to the class. Fed. R. Civ. P. 23(a)(2); *Fabricant v. Sears Roebuck & Co.*, 202 F.R.D. 310, 313 (S.D. Fla. 2001). Here, one common question affecting all Plan purchasers is whether RTG professionally treats its furniture with a stain repellent consistent with its own standards, Shield's standards, and industry standards. ECF No. 114 at 13.[5]

Typicality is also met. To satisfy the typicality requirement of Rule 23(a)(3), the claims

---

[5] Although Defendants consent to the certification of a settlement class, they do not agree that certification would be appropriate outside the settlement context.

of the class representatives must be "typical of the claims or defenses of the class." "[T]ypicality requires a nexus between Plaintiff's claims or defenses and the common questions of fact or law which unite the Settlement Class." *Fabricant*, 202 F.R.D. at 313. This requirement is satisfied in that Plaintiffs' claims are typical of the putative settlement class members' claims because the legal theories and supporting facts relied upon by both Plaintiffs and the putative settlement class members are substantially similar. Here, all claims are based upon a form agreement (the ForceField Plan certificates) and whether RTG met its contractual obligations to professionally treat the furniture. ECF No. 114 at 14.

Finally, Counsel and the Named Plaintiffs are adequate. To satisfy the adequacy requirement of Rule 23(a)(4), two components must be met: (1) Plaintiffs (as class representatives) must have no interest antagonistic to the class, and (2) Class Counsel must possess the competence to undertake the litigation. *Fabricant*, 202 F.R.D. at 314. Here, the Named Plaintiffs are adequate to serve as class representatives, having contributed knowledgably and effectively in the litigation of the case. ECF No. 114 at 14. Plaintiffs have no interests that are adverse or antagonistic to the interests of the Settlement Class. All Settlement Class Members will benefit equally from the relief provided by Settlement of this suit. Proposed Class Counsel are also adequate. Cohen Milstein has extensive experience handling complex class actions and has demonstrated a willingness to vigorously prosecute the class claims. ECF No. 114 at 14, Tab 65 (CMST firm resume). Over the course of this litigation, Proposed Class Counsel have drafted various pleadings, briefed and researched key issues for the Court's consideration, requested and reviewed significant discovery, worked with six experts who produced reports and sat for deposition, and mediated the case. McNamara Decl. at ¶¶4-12.

> 3.     23(b)(3)

The proposed Settlement Class also meets the requirements of Rule 23(b)(3) because (1) common questions of the class predominate over questions that affect only individual members and (2) class resolution is superior to other available methods. Plaintiffs argued these points in the class briefing. *See, e.g.,* ECF No. 114 at 14; Reply Brief ISO Class Cert. (ECF No. 174) at 1-11. Now that the Court may consider that the class will be certified for settlement purposes only, a showing of manageability at trial is not required. *Amchem,* 521 U.S. at 618-20. "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *In re Checking Account Overdraft Litig.,* 275 F.R.D. 666, 676 (S.D. Fla. 2011).

Here, every class member bought a ForceField Plan that promised that the customer's "furniture will be professionally treated before delivery to resist all food and beverage stains that occur in most households." ECF No. 114, Tab 6. This is the common predominating issue. *Id*. at 14-18. Plaintiffs maintain that differences in individual performance would not vitiate that customers still overpaid in buying a "professional" application that was highly variable, and did not meet the standards of RTG or industry experts. ECF No. 174 at 1-9. Moreover, resolution of all class members' claims in this settlement would be far superior than litigating each of these small-dollar claims separately. Such litigation would be repetitive, wasteful, and an extraordinary burden on the courts." *Kennedy v. Tallant*, 710 F.2d 711, 718 (11th Cir. 1983). Accordingly, the requirements of Rule 23(b)(3) are satisfied in this matter for purposes of preliminarily approving the proposed class settlement.

**B.**    **The Settlement Should be Preliminarily Approved**

        *1.*    *The Proposed Settlement is Well Within the Range of Possible Approval, Providing Purchasers Monetary Benefits Consistent with Plaintiffs' Own Damage Model.*

"A class action settlement [ ] should be approved so long as it is fair, adequate and reasonable, and is not the product of collusion between the parties." *Access Now, Inc., v. Claire's Stores, Inc.*, 00-14017-CIV, 2002 WL 1162422, at *4 (S.D. Fla. May 7, 2002) (internal quotation and citations omitted). The proposed settlement provides all claimants refunds consistent with the conjoint survey that Plaintiffs' expert conducted. McNamara Decl. at ¶20. Those experts came up with a 9.5% to 17.5% reduction in the purchase price for the Plans. Those Plans included a three-year warranty, which will continue in effect for those purchasers for whom it is currently in effect. As such, a 10% refund of the purchase price is within the parameters Plaintiffs would have presented at trial. *Id.* Moreover, the vouchers have cash equivalents of 45% of the purchase price, up to $125. Agreement at 12. The vouchers may be combined with other sales and discounts, and may be used on any items sold in RTG stores. *Id.* This Court and others have approved settlements providing for a far lower percentage of the damages model that the plaintiffs would have pursued at trial,[6] including settlements where (unlike this one) there

---

      [6] *See, e.g., Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 542-43 (S.D. Fla. 1988), *aff'd*, 899 F.2d 21 (11th Cir. 1990) (approving settlement equal to 3 to 5% of the per share recovery sought by plaintiffs and observing that "the fact that a proposed settlement amounts to only a fraction of the potential recovery does not mean the settlement is unfair or inadequate"); *Strube v. Am. Equity Inv. Life Ins. Co.*, 226 F.R.D. 688, 698 (M.D. Fla. 2005) (approving settlement equal to about 2% of expert's damages calculation); *In re Currency Conversion Fee Antitrust Litig.*, 2006 WL 3247396, at *6 (S.D.N.Y. Nov. 8, 2006) (approving settlement of antitrust and consumer protection claims by all defendants for "roughly 10-15%" of the allegedly illegal fees collected from the class); *In re Linerboard Antitrust Litig.*, 296 F. Supp. 2d 568, 581 & n.4 (E.D. Pa. 2003) (collecting cases approving settlements for low fractions of potential recovery); *see generally Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, 2005 WL 1213926 at *9 (E.D. Pa. May 19, 2005) (Recovery of 11.4% of estimated damages "compares favorably with the settlements reached in other complex class action lawsuits.").

was no option to elect cash over coupons.[7]

The claims-made structure is not unreasonable in cases such as this, and has been repeatedly approved in this circuit. *Poertner v. Gillette Co.*, 618 Fed. App'x 624, 630 (11th Cir. 2015); *Wilson v. EverBank*, Case No. 14-CIV-22264-BLOOM/VALLE, 2016 WL 457011 at *16 (S.D. Fla. Feb. 3, 2016); *Saccoccio v. JP Morgan Chase Bank, N.A.*, 297 F.R.D. 683, 696 (S.D. Fla. 2014). "Filing a claim form is a reasonable administrative requirement which generally does not impose an undue burden on members of a settlement class." *Hamilton v. SunTrust Mortg. Inc.*, 13-60749-CIV, 2014 WL 5419507, at *6 (S.D. Fla. Oct. 24, 2014) (Cohn, J.).

In addition, the Settlement secures meaningful nonmonetary relief for class members. For example, RTG will alter its sales orders to add an acknowledgement above where the customer signs to note his or her approval of all of the items listed in the sales order, which would include any ForceField Protection Plans purchased. Agreement at 12; McNamara Decl. at ¶21. Second, RTG will retrain its personnel responsible for applying the protectants to help ensure all surfaces (not including the bottom of the furniture or the dust cover) receive the stain protectant. Agreement at 13; McNamara Decl. at ¶21. This retraining will help to ensure adherence to standards acknowledged by RTG of covering all surfaces. *Id.; see also* ECF No. 114 at 15.

> 2.     *The Proposed Settlement Comes After Exhaustive Fact and Expert Discovery*

The settlement does not come early in this litigation. First, Proposed Class Counsel spent considerable time investigating this case pre-filing, testing furniture for evidence of perfluorinated compounds and speaking to former employees. McNamara Decl. at ¶2. After

---

[7] *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 325 (N.D. Ga. 1993) (approving a settlement paid in discount coupons for future air travel equal to 12 to 15% of the potential recovery before trebling; "That the proposed settlement amounts to a fraction of potential recovery does not render the proposed settlement inadequate and unfair.").

discovery commenced, Plaintiffs reviewed thousands of pages of documents from RTG, Shield Industries (that sells ForceField), and ICT Industries (that manufacturers ForceField). *Id*. at ¶7. The discovery obtained included information about all of the six different distribution centers where ForceField is applied. *Id*. at ¶8. Depositions of RTG and Shield personnel followed. *Id*. at ¶7. Plaintiffs also employed an expert to visit the RTG distribution center in Lakeland, Florida, where ForceField would be applied. *Id*. at ¶9; *see also* ECF No. 114 at Tab 60 [Backer Report]. Another expert, a chemist with the American Association of Textile Chemists and Colorists, tested the ForceField product, the application of it, and its efficacy. McNamara Decl. at ¶9. He also examined the practices used by RTG in applying ForceField to different furniture and whether they were consistent with industry standards. *Id*.; *see also* ECF No. 174 at 1-2. Two economists and a survey expert examined the amounts of ForceField applied, and after conducting a market research survey and a conjoint analysis, opined on how much less potential purchasers might pay had they known about RTG's alleged application practices. McNamara Decl. at ¶9; ECF No. 174 at 8. Thus, Plaintiffs amassed significant information before reaching this settlement.

3.   *The Risk, Expense, Complexity, and Likely Duration of Future Litigation of the Actions Weighs in Favor of Preliminary Approval*

The Eleventh Circuit has recognized that "[p]ublic policy strongly favors the pretrial settlement of class action lawsuits." *In re United States Oil and Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992). Settlement "has special importance in class actions with their notable uncertainty, difficulties of proof, and length. Settlements of complex cases contribute greatly to the efficient utilization of scarce judicial resources, and achieve the speedy resolution of justice...." *Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 538 (S.D. Fla. 1988), *aff'd*, 899 F.2d 21 (11th Cir. 1990) (citations omitted). As a general matter, "unless the settlement is clearly

18

inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." ALBA CONTE & HERBERT NEWBERG, NEWBERG ON CLASS ACTIONS §11.50, at 155 (4th ed. 2002).

Here, settlement is desirable for several reasons. First, Plaintiffs' class certification theory relies on the inconsistency of RTG's application practices to assert that all customers failed to get the professional treatment RTG promised, regardless of whether a customer actually received effective stain repellency. ECF No. 174 at 1-4. It is unclear whether this Court or the Eleventh Circuit would ultimately accept class certification, and not conclude individualized examination of each customer's furniture would be required, as RTG has argued. *See, e.g.,* Defs.' Opp. to Class Cert. (ECF No. 135) at 19. RTG has also called into question the fit of Plaintiffs' damage model to provide class-wide damage relief. *See, e.g.,* Defs.' Sur-Reply in Opp. to Class Cert. (ECF No. 200) at 3-4. Settlement of this case—at percentage amounts similar to what Plaintiffs' own marketing expert calculated—avoids the risk of this Court or the Eleventh Circuit rejecting class certification.

Settlement here also heads off future litigation. Plaintiffs' counsel filed a related action in North Carolina. *Triplett v. Rooms To Go North Carolina Corp., d/b/a/ Rooms To Go, et al.*, Case No. 5;16-cv-926-FL (E.D.N.C.). That case would be resolved as well. Plus, all other states where RTG sells would be included, and the most expansive statute of limitations would apply. Agreement at ¶I(A)(8).

> 4.    *The Settlement is the Result of Arms-Length Negotiations after Extensive Discovery and Investigation*

In assessing at the preliminary approval stage whether a proposed settlement raises any issue as to fairness, courts often focus on whether the settlement is the product of arms-length negotiations. *See, e.g.*, *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1290 (9th Cir. 1992).

The proposed Settlement should be preliminarily approved here, as "[t]he assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive." *Adams v. Inter-Con Sec. Sys., Inc.*, No. C-06-5428 MHP, 2007 WL 3225466, at *3 (N.D. Cal. Oct. 30, 2007); *see also In re Indep. Energy Holdings PLC*, No. 00 Civ. 6689(SAS), 2003 WL 22244676, at *4 (S.D.N.Y. Sept. 29, 2003) ("[T]he fact that the settlement was reached after exhaustive arm's-length negotiations, with the assistance of a private mediator experienced in complex litigation, is further proof that it is fair and reasonable.").

Here, the settlement was reached only after several negotiating sessions overseen by professional mediator, Rodney Max, who has particular experience with class actions and other complex litigation. Max Decl. at ¶¶5-7. Two full mediations days were devoted to seeing if the contours of a global settlement could be reached. McNamara Decl. at ¶13; Max Decl. at ¶12. Afterwards, the parties continued communications via email and teleconference. McNamara Decl. at ¶14. Only once the settlement terms were hammered out was the topic of attorney fees and costs addressed. *Id*. at ¶¶15; Max Decl. ¶12. As Mr. Max declares, "[t]his settlement, including the relief provided to the class and the agreed-to request for an award of attorneys' fees, is a fair and non-collusive settlement that was conducted at arm's length by skilled, well informed lawyers with sufficient discovery and investigation prior to the mediation, and through the intense, lengthy mediation process described above." Max Decl. at ¶16. This supports preliminary approval. *Hall v. Bank of America, N.A.,* No. 1:12-cv-22700-FAM, 2014 WL 7184039, at *6 (S.D. Fla. Dec. 17, 2014) (noting absence of collusion of mediated settlement contradicted objections to claims-made settlement).

   5.     *The Notice Plan and the Form of the Notice are Reasonable*

Before final approval of a class settlement, "[t]he court must direct notice in a reasonable

20

manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1).

"For any class certified under Rule 23(b)(3), the court must direct to class members the best

notice that is practicable under the circumstances, including individual notice to all members

who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). This requirement,

derives from Rule 23 and the Due Process Clause, and has two primary components: manner of

distribution and content. *Adams v. S. Farm Bureau Life Ins. Co.*, 493 F.3d 1276, 1286 (11th Cir.

2007). The distribution of notice should be reasonably likely to reach the class members. *Id.* The

content must adequately describe the substantive claims and "contain information reasonably

necessary to make a decision to remain a class member and be bound by the final judgment or

opt out of the action." *Twigg v. Sears, Roebuck & Co.*, 153 F.3d 1222, 1227 (11th Cir. 1998)

(internal quotations and citation omitted). The notice need not contain every fact, as "an overly

detailed notice" has the potential to "confuse class members and impermissibly encumber their

rights to benefit from the action." *Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1239 (11th

Cir. 2011) (internal citations and footnote omitted).

     Here, both the notice distribution plan and the form of the notice meet the requirements

of Rule 23 and Due Process. First, the notice plan calls for email notice if RTG possesses an

email address, using best practices to ensure the validity of the addresses and that the email will

reach the intended recipient. *See, e.g., Morgan v. Pub. Storage*, No. 14-21559 (S.D. Fla. Mar. 10,

2016), D.E. 407 (Order at 7-8, 38-41) (approving class settlement where 90% of the class was

notified by email and noting the efficacy of industry best email practices); *Manner v. Gucci

America, Inc.*, Case No. 15-cv-00045, 2016 WL 1045961, at *2, *8 (S.D. Cal. March 16, 2016)

(approving email notice in consumer class action, with mailed notice used only if email was

returned undeliverable); *Relente v. Viator, Inc.*, Case No. 12-cv-05868, 2015 WL 2089178, at *2

(N.D. Cal. May 4, 2015) (approving email notice in consumer protection case, with postcards mailed only if emails bounced). Recipients will be notified by direct mail where RTG has only a physical address or if the email bounces back. Agreement at 13, ¶IV(A)(1). If the mailed postcard is returned as undeliverable, the settlement administrator is required to perform a reasonable address search, and send out a second postcard notice if an address can be found. *Id.*

This notice plan suffices. RTG is employing KCC as claims administrator. Agreement at 10, ¶I(A)(22). KCC is well-known and experienced in the area of class action administration. *See, e.g., Legg v. E-Z Rent A Car, Inc.*, No. 6:14-cv-1716-ORL-40DAB, 2015 WL 10818745, at *2 (M.D. Fla. May 28, 2015) (granting final approval to settlement administered by KCC); *Poertner v. Gillette Co.,* No. 6:12–cv–803–Orl–31DAB, 2014 WL 4162771 (MD. Fla., Aug. 21, 2014) (same); *Manner,* 2016 WL 1045961 (finding that email and mail notice program administered by KCC satisfied Rule 23 and due process). *See also* Ex. 4, Carameros Decl. at ¶¶4-5. When RTG sells its furniture, it keeps electronic records of each purchase. These records include a physical address, which is used for delivering the treated furniture. McNamara Decl. at ¶8. Plaintiffs understand that if a customer contacts RTG after moving (e.g., to request service under the Plan warranty), RTG updates the customer's address in its database. Also, RTG receives email addresses at the time of purchase and through other interactions with its customers, as described above. Thus, these are email addresses voluntarily provided to RTG directly from the customers. KCC will be using best practices to ensure these email addresses receive the class notice. Carameros Decl. at ¶8. However, if KCC confirms that the email notice went undelivered, the class member will receive direct mail notice at an address that KCC will have used best practices to update and verify. *Id.* at ¶¶9-11. This combination of direct mail and email notice has been found by this Court and others to constitute fair and reasonable notice for a

class settlement. *See, e.g., Khoday, et al., v. Symantec Corp.,* No. 11-CV-180 (JRT/TNL), 2016 WL 1637039, at *7 (D. Minn. Apr. 5, 2016), *report and recommendation adopted*, No. 11-CV-0180 (JRT/TNL), 2016 WL 1626836 (D. Minn. Apr. 22, 2016), *aff'd sub nom. Caligiuri v. Symantec Corp.*, 855 F.3d 860 (8th Cir. 2017) (granting preliminarily approval of consumer class action settlement where defendants provided notice to class members at their last known email address, or by mailing postcards to their last known physical address for members with an invalid or an unknown email address); *Morgan v. Pub. Storage*, No. 14-21559 (S.D. Fla. Mar. 10, 2016), D.E. 407 (Order at 38-41); *Manner,* 2016 WL 1045961, at *2, * 8; *Relente*, 2015 WL 2089178, at *2; *Family Med. Pharmacy, LLC v. Trxade Group, Inc.,* Civ. A. No. 15-0590-KD-B, 2016 WL 6573981 at * 9 (S.D. Ala. Nov. 4, 2016); *Hall v. Bank of America, N.A*., No. 1:12-CV-22700-FAM, 2014 WL 7184039, at *3 (S.D. Fla. Dec. 17, 2014); *Hamilton v. SunTrust Mortg. Inc.*, No. 13-60749 (S.D. Fla. June 18, 2014), ECF No. 165 Order at 5-6); *Perez v. Asurion Corp.,* 501 F.Supp.2d 1360, 1375-1377 (S.D. Fla. 2007). KCC will also create a settlement website and a toll-free number. Agreement at 14; Agreement Ex. E; Carameros Decl. at ¶¶13-14. Class Counsel will also post a media statement on their website. *Id.* at ¶I(A)(5), McNamara Decl. at ¶22, and may supply a press release in response to media inquiries. *Id.* at Agreement Ex. G; McNamara Decl. at ¶22.

Secondly, the form of the proposed notice comports with Due Process and Rule 23. The notice, the website, and claim forms adequately describe the proceedings, are written in objective and neutral terms, and are easily understandable. *Twigg*, 153 F.3d at 1227. For example, the postcard notice provides a unique identifying number that the recipient can use on the settlement website to determine how much she will receive under the options and to file a claim electronically, with ease. Agreement at 13-14 & Ex. (D). The long form notice, located at the

website, contains a summary of the class action settlement, the available benefits, the deadlines

to act, the addresses of the Court and class counsel, and provides the information in a question

and answer format. Agreement at Ex. E. Similar content has been found to be reasonable,

adequate and sufficient notice. *Family Med. Pharmacy*, 2016 WL 6573981 at \*9; *In re Checking*

*Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1342 (S.D. Fla. 2011).

      The claim form is five pages long, with three pages of instructions, and two pages for the

class member to complete. Agreement at Ex. F. Class members need only provide their name,

address, email address, phone number, and claim number (from the email or postcard); select

whether they wish a cash payment or a merchandise voucher, and then sign. *Id*. They can file the

form electronically at the settlement website or print it and mail it to KCC. *Id*.; Carameros Decl.

at ¶¶15-16. Thus, the notice documents are reasonably calculated to inform the settlement class

members of their rights and facilitate claims and they are not overly complicated.

      6.    *The Requested Fees and Costs and Incentive Awards are Within the*
               *Range of Reason*

      The requested fees, costs, and awards are fair and reasonable. The parties negotiated this

amount only *after* all of the other terms of the Agreement were reached. McNamara Decl. at

¶¶15-16; Max Decl. at ¶¶12, 15. *Poertner v. Gillette Co.*, 618 Fed. App'x 624, 630 (11th Cir.

2015) (finding a "clear sailing" provision wherein defendant would not oppose fees above a

certain amount was not a "red flag" for self-dealing when the record showed "that parties settled

only after engaging in extensive arms-length negotiations moderated by an experienced, court-

appointed mediator."). RTG has agreed to pay up to $4 million in fees and expenses to Class

Counsel. Agreement at 20. This amount includes expenses for six experts that exceed $475,000.

McNamara Decl. at ¶9. Class counsel took or defended 30 depositions, reviewed thousands of

pages of documents, and filed numerous motions and briefs during some very contentious

24

litigation. *Id*. at ¶¶4-12.[8] The requested amount is less than 30% of the maximum monetary relief available to the class ($13.5 million), and a far smaller percentage of the potential dollar equivalents available to Plan purchasers who choose the vouchers. *Accord Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1295-96 (11th Cir. 1999) (approving fee of 33 1/3 percentage of benefits available to pay claims). Courts in this district have accepted a "percentage of the fund" approach to evaluate the appropriateness of attorney's fees in a claims-made settlement class action like this one. *Marty v. Anheuser-Busch Cos., LLC*, No. 13-CV-23656-JJO, 2015 WL 6391185 at *2 (S.D. Fla. Oct. 22, 2015) (collecting cases). Further, as this Court has confirmed, the fee is properly calculated as a percentage of the total cash available to pay claims under the settlement, rather than a percentage of funds paid out. *See, e.g., Hamilton v. SunTrust Mortg., Inc.*, No. 13-cv-60749, 2014 WL 5419507, at * 7 (S.D. Fla. Oct. 24, 2014) (Cohn, J.) (citing *Waters*, 190 F.3d at 1295-96). Using either the cash or the voucher option, the percentage of the fund that the attorneys' fees and expenses would comprise is well within a reasonable range.

In addition, Plaintiffs have secured nonmonetary relief for the proposed national class, as described above. Agreement at 12-13; McNamara Decl. ¶21. The Court may also consider nonmonetary relief when assessing the reasonableness of a fee request. *Poertner v. Gillette Co.*, 618 Fed. App'x 624, 629 (11th Cir. 2015).

Class Counsel also seek incentive awards for the Named Plaintiffs in this action. Agreement at 20. "Courts routinely approve incentive awards to compensate named plaintiffs for the services they provide and the risks they incurred during the course of the class action

---

[8] Prior to final Approval, Class Counsel will file a separate motion for attorney's fees and expenses, and will describe the reasonableness of their fee and expenses incurred in light of the amount of work performed.

litigation." *Ingram v. The Coca-Cola Co.*, F.R.D. 685, 694 (N.D. Ga. 2001). Small awards, which serve as premiums in addition to any claims-based recovery from the settlement, promote the public policy of encouraging individuals to undertake the responsibility of representative lawsuits. See MANUAL FOR COMPLEX LITIGATION § 21.62 n. 971(4th ed. 2006) (awards may be "merited for time spent meeting with Class members, monitoring cases, or responding to discovery"); *Wilson v. EverBank*, 2016 WL 457011, at *15 (approving $5,000 service awards for class representatives acting as "private attorney generals seeking a remedy for what appeared to them to be a public wrong"). Here, the Named Plaintiffs sat through depositions, provided documents, and helped answer interrogatories. McNamara Decl. at ¶23. Several of the representatives (Hankinson, Guerra, and Gandolfo) forewent a $2,000 Rule 68 offer to walk away from the litigation back in September of 2015. *Id.*; *see also* Defs.' Mtn. to Dismiss for Lack of Jurisdiction (ECF No. 15). The proposed service award is reasonable in light of the time and effort committed to this litigation.[9]

## V.    PROPOSED SCHEDULE OF EVENTS

Plaintiffs, with consent of Defendants, propose the following schedule for the Settlement-related events in this case. The proposed dates are respectfully requested.

1.    Deadline for mailing notice and establishment of Settlement Website – **45 days** after Preliminary Approval Order.

2.    Deadline for submitting exclusion requests or objections **– 60 days after the Notice Date**.

3.    **No later than 5 days after** the Opt-Out Deadline, the Settlement Administrator

---

[9] The plaintiffs who dismissed their case voluntarily during the litigation are not included for service awards.

shall provide a final report to Class Counsel and Counsel for RTG summarizing the total number of exclusion requests received.

4.      Settlement Class Members and their attorneys, if applicable, intending to appear at the final Fairness Hearing must serve a notice meeting the requirement of the preliminary approval order on Class Counsel and RTG's Counsel, and file with the Clerk of Court, no later than **15 days** prior to the Fairness Hearing.

5.      Class Counsel must file its Application for Attorney's Fee and Expenses **30 days after** the **Notice Date**, and file any additional memoranda **no later than 10 days prior** to final Fairness Hearing.

6.      Settlement Class Members participating in the settlement must submit claim forms **no later than 30 days** after the Final Approval hearing.

## VI.    THE COURT SHOULD SCHEDULE A FINAL APPROVAL HEARING

The last step in the settlement approval process is the final approval hearing, where Plan purchasers who timely submit objections to the proposed Settlement may be heard, and the Court makes a final determination about the propriety of the Settlement. Fed. R. Civ. P. 23(e)(1). Based on the timetable for giving notice and submitting objections to the Settlement set forth above, Plaintiffs request that the final approval hearing in this case be scheduled as soon as practicable for the Court, after the expiration of the Objection and Opt-Out Deadlines set forth above.

## VII.   CONCLUSION

For the reasons stated above and based on the authority cited, Plaintiffs respectfully request that this Court grant the Motion for Preliminary Approval and enter the proposed Preliminary Approval Order, which is attached as Exhibit 1(A) and submitted herewith.

Dated: July 17, 2017                    Respectfully submitted:

                                        By:  /s/ Douglas J. McNamara

                                        Theodore J. Leopold
                                        Leslie M. Kroeger
                                        Diana L. Martin
                                        COHEN MILSTEIN SELLERS & TOLL
                                        PLLC
                                        2925 PGA Boulevard, Suite 200
                                        Palm Beach Gardens, FL  33410
                                        Telephone:  (561) 515-1400
                                        Facsimile:   (561) 515-1401
                                        tleopold@cohenmilstein.com
                                        lkroeger@cohenmilstein.com
                                        dmartin@cohenmilstein.com

                                        Douglas J. McNamara (pro hac vice)
                                        Eric A. Kafka (pro hac vice)
                                        COHEN MILSTEIN SELLERS & TOLL
                                        PLLC
                                        1100 New York Ave. NW, Ste. 500
                                        Washington, DC 20005
                                        Telephone: (202) 408-4600
                                        Facsimile: (202) 408-4699
                                        dmcnamara@cohenmilstein.com
                                        ekafka@cohenmilstein.com

                                        *Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on July 17, 2017, a true and correct copy of the foregoing was served by transmission of Notice of Electronic Filing generated by CM/ECF on all counsel or parties of record on the Service List below.

/s/ Douglas J. McNamara

## SERVICE LIST

Jamie Zysk Isani (Florida Bar No. 728861)
)
HUNTON & WILLIAMS LLP
1111 Brickell Avenue, Suite 2500
Miami, Florida 33131
Telephone: (305) 810-2500
Facsimile: (305) 810-1675
jisani@hunton.com
ddreier@hunton.com

Walfrido J. Martinez (Florida Bar No. 917930)
HUNTON & WILLIAMS LLP
200 Park Avenue
New York, New York 10166
Telephone: (212) 309-1316
Facsimile: (212) 309-1100
wmartinez@hunton.com

Randi Engel Schnell (pro hac vice)
Frank M. Lowrey IV (pro hac vice)
Joshua F. Thorpe (pro hac vice)
BONDURANT MIXSON & ELMORE LLP
One Atlantic Center
1201 West Peachtree Street NW, Suite 3900
Atlanta, GA 30309
Telephone: (404) 881-4100
Facsimile (404) 881-4111
flowrey@bmelaw.com
schnell@bmelaw.com
thorpe@bmelaw.com

*Counsel for Defendant R.T.G Furniture Corp.*

Theodore J. Leopold
Leslie M. Kroeger
Diana L. Martin
COHEN MILSTEIN SELLERS & TOLL PLLC
2925 PGA Boulevard, Suite 200
Palm Beach Gardens, FL 33410
Telephone:  (561) 515-1400
Facsimile:  (561) 515-1401
tleopold@cohenmilstein.com
lkroeger@cohenmilstein.com
dmartin@cohenmilstein.com

Douglas J. McNamara
Eric A. Kafka
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave. NW, Ste. 500
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
dmcnamara@cohenmilstein.com
ekafka@cohenmilstein.com

*Counsel for Plaintiffs*